UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| CLINTON B. RUSH,<br><br>    Plaintiff,<br><br>vs.<br><br>ANDREW D. WEINSTEIN; DONALD HEIDA; and JANET MURAKAMI,<br><br>    Defendants. | Case No.: 1:18-cv-00073-REP<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>**(Dkt. 85)** |

Pending is Defendants' Renewed Motion for Summary Judgment (Dkt. 85). All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 29). Because disputes of material fact surround the manner in which Defendants employed pepper spray to subdue Plaintiff, the Court cannot entirely dismiss either (i) Plaintiff's excessive force/bodily integrity claims against Defendants, or (ii) Plaintiff's First Amendment retaliation claim against Defendants Weinstein and Murakami.[1] Still, owing to the claims' many moving parts, Defendants' motion is granted in part and denied in part.

I. **GENERAL FACTUAL BACKGROUND**

On October 4, 2017, Defendant Idaho State Police ("ISP") Specialist Janet Murakami responded to a call from officials at the East Boise Port of Entry ("POE") on behalf of a driver who believed that he was being followed and harassed. Murakami Aff. at ¶¶ 1-4 (Dkt. 74-5). When she arrived at the POE, Specialist Murakami learned that Plaintiff Clinton Rush had been tailgating the driver's truck-trailer from a trucking yard in Caldwell, Idaho to the POE (en route to Salt Lake City, Utah). *Id*. at ¶¶ 7-11. Mr. Rush suffers from a mental illness that can cause

---

[1] To the extent Plaintiff has asserted a First Amendment retaliation claim against Defendant Heida, it is dismissed. *See infra*.

**MEMORANDUM DECISION AND ORDER - 1**

him to be in a delusional and paranoid state at times. Pl.'s SODF Nos. 2-3 (Dkt. 88-1). To that end, he told Specialist Murakami that the truck-trailer was "transporting dead bodies for a white supremacy group out of Caldwell." *Id*. at No. 3; *see also* Murakami Aff. at ¶ 12 ("I asked Rush what was going on. Mr. Rush stated that he was investigating the Simplot company assisting the Aryan Nations in killing people and dissolving the bodies in vats which were being transported by the truck he was following. Mr. Rush made other statements of a delusional and paranoid nature while taking pictures of myself and trucks that were traveling through the POE."). Specialist Murakami thought that Mr. Rush should be placed on a "mental hold" at the nearest medical facility and radioed for assistance. Murakami Aff. at ¶¶ 14-16. Defendant ISP Trooper Andrew Weinstein soon arrived. *Id*. at ¶ 17.

Trooper Weinstein's role was to monitor and interact with Mr. Rush while Specialist Murakami investigated Mr. Rush's background. Weinstein Aff. at ¶ 5 (Dkt. 85-3). During that time, Mr. Rush continued taking photographs (including of Trooper Weinstein) and told Trooper Weinstein that the truck-trailer he had been following "was carrying fecal matter and spreading it all over while Israel was overhead taking photos of everything" and that he "was lacing the whole scene down to the bit." *Id*. at ¶ 6; *see also id*. at ¶ 9 ("Rush talked about how 'the bit' controlled everything. When I asked what 'the bit' was, he was unable to explain it to me. He pointed out passing trucks and random objects, as part of the 'bit.'"). Trooper Weinstein and Specialist Murakami confirmed that, based on Mr. Rush's erratic thoughts and paranoid behavior and speech, he should be evaluated for mental health issues and was a candidate for a mental hold. *Id*. at ¶ 11, 22-24; Murakami Aff. at ¶ 18. Because Mr. Rush had a history of violence toward law enforcement and was on felony parole for aggravated battery (which Specialist Murakami learned after speaking with Mr. Rush's parole officer during the interim), they agreed that a third officer should be called for assistance. *Id*.

**MEMORANDUM DECISION AND ORDER - 2**

By the time Defendant ISP Trooper Donald Heida arrived on the scene, Mr. Rush, Specialist Murakami, and Trooper Weinstein were standing in a loose circle near Mr. Rush's car. Murakami Aff. at ¶ 20.  Before Trooper Heida could exit his vehicle, however, Mr. Rush punched Trooper Weinstein in the face.  Weinstein Aff. at ¶ 14.  Trooper Weinstein pushed Mr. Rush back and drew his baton while Specialist Murakami secured her pepper spray; for his part, Trooper Heida also deployed his baton, approached Mr. Rush, and instructed him to get on the ground.  *Id*. at ¶¶ 15-16; Murakami Aff. at ¶ 24; Heida Aff. at ¶ 6 (Dkt. 74-3).  As he was backing away, Specialist Murakami pepper-sprayed Mr. Rush who simultaneously tripped and fell backwards.  Weinstein Aff. at ¶ 17; Murakami Aff. at ¶ 24; Heida Aff. at ¶¶ 6-7.

What happened next is not captured on video and, not surprisingly, is the subject of the instant action.  Defendants claim that they wrestled Mr. Rush to the ground, turned him over face-down, handcuffed him, and arrested him – without ever hitting Mr. Rush with their batons (or otherwise beating him) or pepper-spraying him further.  Weinstein Aff. at ¶¶ 17-19, 26; Murakami Aff. at ¶ 24-27, 35; Heida Aff. at ¶¶ 7-8, 16-17.  Mr. Rush's account is markedly different; he claims that he was beaten while on the ground, culminating in him being pepper-sprayed down the front of his pants (he does not know by whom).  Pl.'s SODF No. 21 ("They sprayed mace down my pants.  Someone reaches up underneath me and puts their hand down my pants and deploys the pepper spray as the other one's trying to pull my pants down. . . .  They were pulling me up as that was going on.  As they pulled – as they put the pepper spray down my pants – pulled down my pants and sprayed the pepper spray, they were pulling up my pants all in one motion, standing me up off the ground.").

Mr. Rush's claims against Defendants are therefore informed by what he alleges transpired that day – namely, that being beaten and pepper-sprayed in the groin (i) supports Fourth Amendment excessive force and bodily integrity claims, and (ii) amounts to an

**MEMORANDUM DECISION AND ORDER - 3**

unconstitutional retaliation for taking photographs of Specialist Murakami and Trooper Weinstein under the First Amendment. *See* 6/19/18 IRO (Dkt. 12). Defendants now move for summary judgment, arguing that "there is not even a scintilla of evidence to support Mr. Rush's assertions against . . . Defendants except Mr. Rush's beliefs." Defs.' Mem. ISO MSJ at 6 (Dkt. 85-1).

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. at 252.

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id*. at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## III. DISCUSSION

Mr. Rush's claims against Defendants are brought under 42 U.S.C. § 1983, the civil rights statute. To state a valid claim under § 1983, a plaintiff must show "(i) that a person acting under color of state law committed the conduct at issue, and (ii) that the conduct deprived the

**MEMORANDUM DECISION AND ORDER - 4**

claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988). "A person deprives another 'of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].'" *Id*. at 633 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

Here, Mr. Rush alleges that Specialist Murakami and Troopers Weinstein and Heida, acting under color of state law, deprived him of his rights under the Fourth Amendment (excessive force/bodily integrity claims) and the First Amendment (retaliation claim) when they beat and pepper-sprayed him in the groin preceding his October 4, 2017 arrest. The Court addresses each claim in turn.

**A.      Genuine Disputes of Material Fact Surround Mr. Rush's Excessive Force/Bodily Integrity Claims Under the Fourth Amendment**

   1.      <u>Legal Standard</u>

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Encompassed within the term "unreasonable seizure" is the right to be free from excessive force and protection from "unreasonable intrusions on one's bodily integrity." *Fontana v. Haskin*, 262 F.3d 871, 878-79 (9th Cir. 2001); *United States v. Kriesel*, 508 F.3d 941, 948 (9th Cir. 2007) (the Fourth Amendment's prohibition on excessive force is premised on the notion that "bodily integrity [is] 'a cherished value in our society.'") (quoting *Schmerber v. California*, 384 U.S. 757, 772 (1966)). Claims that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Davis v. City of Las Vegas*, 478 F.3d

**MEMORANDUM DECISION AND ORDER - 5**

1048, 1054 (9th Cir. 2007).  To state a Fourth Amendment claim, a plaintiff must show that the amount of force used was unreasonable or that the manner in which the arrest was effectuated was an unlawful intrusion into his bodily integrity.  *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008).

The right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat.  *Graham*, 490 U.S. at 395.  However, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*; *Gregory*, 523 F.3d at 1106.  Determining whether the force used is reasonable "requires balancing the 'nature and quality of the intrusion'" on an individual's Fourth Amendment interest against the "'countervailing governmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances."  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*quoting Graham*, 490 U.S. at 396).

With respect to the Fourth Amendment intrusion side of the balance, courts must "assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted."  *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  With respect to the countervailing government interest side of the balance, courts must consider the three factors established in *Graham*:  (i) the severity of the suspect's alleged crime; (ii) the threat posed by the suspect to the officers and the public; and (iii) whether the suspect was actively resisting or evading arrest.  *Graham*, 490 U.S. at 396.  These factors are not exclusive; rather, courts "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).  For example, as is possibly relevant here, courts may take into account the fact that a plaintiff is "emotionally disturbed" in their *Graham* balancing.  *Deorle v.*

**MEMORANDUM DECISION AND ORDER - 6**

*Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *see also Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994) (listing the following additional factors a court may consider: "whether a warrant was used, whether the plaintiff resisted or was armed," the number of suspects or officers involved, whether the plaintiff was sober, "the availability of alternative methods" of effecting the arrest, "the nature of the arrest charges," and "whether other dangerous or exigent circumstances existed at the time of the arrest").

Summary judgment should be granted sparingly for excessive force claims. *See Gregory*, 523 F.3d at 1106. "This is because such cases almost always turn on a jury's credibility determinations." *Smith*, 394 F.3d at 701; *see also Scott v. Harris*, 550 U.S. 372, 383 (2007) (summary judgment motions in excessive force actions require courts to "slosh [their] way through the fact-bound morass of 'reasonableness'"); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").

2.  Analysis

Mr. Rush's excessive force/bodily integrity claims stem from his insistence that Defendants purposely pepper-sprayed him down the front of his pants as part of his arrest. To his credit, Defendants' counsel acknowledged during oral argument that, if true, such conduct would amount to excessive force and that qualified immunity would not apply. *See also Guy v. City of San Diego*, 608 F.3d 582, 589 (9th Cir. 2010) ("[E]ven when police officers reasonably must take forceful actions in response to an incident, and even when such forceful actions are permissible at first, if the officers go too far by unnecessarily inflicting force and pain after a person is subdued, then the force, unnecessary in part of the action, can still be considered excessive. As an example, . . . to use pepper spray to cause pain without any need to use it for

**MEMORANDUM DECISION AND ORDER - 7**

safety, may be considered excessive force by a jury."). But according to Defendants, that never happened; indeed, *could not* have happened when the unifying thread to his account – that his groin area was saturated in a red-orange substance that took days to clean off – unravels when understanding that the pepper spray issued to and used by Defendants contained no red dye (or any type of dye) at all. Defs.' Mem. ISO MSJ at 17-19. Defendants' argument logically tracks, but fails to capture the depth of the required analysis.

To begin, this case is not about whether Mr. Rush struck Trooper Weinstein in the face, whether he resisted arrest, whether pepper spray should have been deployed to initially subdue him and neutralize his threatening behavior, or whether he should have been arrested. Those are undisputed facts (at least for the purposes of Defendants' at-issue motion). Instead, this case turns on whether Mr. Rush was intentionally pepper-sprayed down his pants and directly onto his crotch. *See id*. at 11 (Defendants acknowledging that "[t]he only questions remaining are whether [Mr. Rush] was 'beaten' and sprayed in his groin area."). On that lynchpin issue, the record does not provide an answer – one way or the other – as a matter of law.

Mr. Rush's excessive force/bodily integrity claims begin with a fair dose of skepticism, informed in part by the following: (i) Mr. Rush was in a delusional/paranoid state at the time of the incident; (ii) he was combative, hit Trooper Weinstein in the face, and resisted arrest; (iii) the available video evidence does not support his claim of being beaten (only minimal abrasions to his face are apparent) or pepper-sprayed down his pants (his pants are tightly-secured around his waist by a buckled belt and there are no obvious signs of pepper spray anywhere on the pants themselves); (iv) he did not complain about being beaten or pepper-sprayed down his pants until over a month later; and (v) all of the non-party eyewitnesses dispute his account of the events that day. Defs.' Mem. ISO MSJ at 13-15. Without more, these factors would typically combine to cut against Mr. Rush's allegations and likely warrant summary judgment in Defendants' favor

**MEMORANDUM DECISION AND ORDER - 8**

because no reasonable juror could find by a preponderance of the evidence that he is entitled to a verdict in such a setting. Except there *is* more.[2]

Per agreement of the parties, the clothes Mr. Rush wore that day were kept in a chain of custody and sent to Aerosol Research and Engineering Laboratories ("AREL") for forensic testing. Pl.'s SODF No. 29 ("Every procedure and step taken in this process was done in coordination and cooperation with Defendants' then-counsel, who expressed complete confidence that evidence and chain-of-custody had been properly preserved.").[3] The subsequent March 16, 2020 AREL Report confronted whether Oleoresin Capsicum ("OC") spray[4] could be detected on Mr. Rush's pants and boxer shorts. *See* 3/16/20 AREL Rpt. at 3 ("[T]he analysis of capsaicinoids and major degradation product, vanillic acid, is integral in the confirmation or nulling of Plaintiff's claim that the officers named administered OC spray down his pants directed at his groin region at close range during his arrest on October 4, 2017."). Ultimately, the AREL Report confirmed as much, concluding:

---

[2] To be clear, the "more" relates only to Mr. Rush's claim that he was pepper-sprayed down his pants. *See infra*. Setting that unique aspect of the case aside, there is no doubt that some degree of force was necessary and appropriate to initially subdue and arrest Mr. Rush. With that in mind, the available evidence does not align with Mr. Rush's account that he was beaten during that process (apart from allegedly being purposely pepper-sprayed on his groin as addressed herein). *See supra*. Summary judgment is in fact warranted as to *that* discrete component of Mr. Rush's excessive force/bodily integrity claims.

[3] At oral argument, Defendants' current counsel confirmed that there were no chain-of-custody issues pertaining to the handling of Mr. Rush's clothing.

[4] OC spray, or "pepper spray," is a non-lethal policing tool used to incapacitate violent or threatening subjects. According to the AREL Report, the three major capsaicinoid compounds (the pepper agent) used in the production of OC spray are (i) capsaicin, (ii) dihydrocapsaicin, and (iii) nonivamide. 3/16/20 AREL Rpt. at 3, attached as Ex. B to Bentley Decl. (Dkt. 88-4). The AREL Report goes on to claim that, "[w]hen capsaicinoids are exposed to skins, a hydrolysis reaction occurs forming the metabolite vanillic acid." *Id.* Therefore, as more-or-less confirmed at oral argument, this Memorandum Decision and Order presumes that the detection of any capsaicinoid compound and/or vanillic acid via forensic testing equates to the presence (at some moment in time) of OC spray in those same areas tested.

**MEMORANDUM DECISION AND ORDER - 9**

> Based on the samples analyzed from the evidence items provided, AE9 (Plaintiff's boxers) and AE10 (Plaintiff's jeans), *there is a presence of capsaicinoids and a major degradation product, vanillic acid, on the groin region of each article of clothing*.  Upon visual inspection, several small splotches were observed throughout the groin region of AE10.  Red dye markers are often found in Oleoresin Capsicum (OC) spray formulations commonly used by law enforcement.  Therefore, if the OC spray was administer to Plaintiff's groin region, red staining would occur.
>
> The largest concentration of red staining was observed on the right of the fly groin area.  *This area is also where we found the highest level of capsaicinoids and vanillic acid on both articles of clothing.*  The left of the fly groin samples yield minute or no capsaicinoids and vanillic acid.  *This is evidence of the spray being administered at close proximities with minimal room for the spray to plume and disperse outside of its direct spray route, leading to a higher concentration of the spray solution to collect in one area of both articles of clothing.  Additionally, item AE9 yields a higher concentration of microgram (μg) of capsaicinoids and vanillic acid per milligram (mg) of sample taken from the item.  This is consistent with the Plaintiff's claim that the OC spray was administered down his pants aimed at his groin region . . . .  This region is also where we found the highest level of capsaicinoids and vanillic acid on both articles of clothin*g.

*Id*. at 14 (emphasis added).  In short, the Court understands the AREL Report to say that the forensic testing on Mr. Rush's clothing can be interpreted as supporting Mr. Rush's claims (or at the very least not precluding Mr. Rush's claims outright).

Without conceding that pepper spray was ever deployed down Mr. Rush's pants, Defendants neither dispute the existence of capsaicinoid(s)/vanillic acid on Mr. Rush's clothing, nor discount the possibility that such components could have been from the pepper spray deployed by Specialist Murakami (or Troopers Weinstein and Heida, for that matter, because each was issued the same pepper spray product).  Rather, their expert addresses the AREL Report largely by focusing on (i) technical discrepancies (nomenclature-related) in the chemical profile of OC sprays generally, and thus the specific OC spray found on Mr. Rush's pants and boxer shorts; (ii) the claimed-association between red "splotches" on Mr. Rush's pants and the corresponding administration of pepper spray thereon, when the pepper spray used by Defendants contained no red dye; (iii) inconsistencies between the composition of capsaicinoids

**MEMORANDUM DECISION AND ORDER - 10**

found in Mr. Rush's clothing and the pepper spray used by Specialist Murakami; (iv) selective reliance on incomplete data points to support the conclusion that Mr. Rush was pepper-sprayed down his pants; and (v) alternative explanations for how properly-deployed pepper spray could nonetheless be detected within Mr. Rush's pants and boxer shorts. *See generally* 9/25/20 Kapeles Rpt. at 3-14, attached as Ex. B to Kapeles Decl. (Dkt. 74-6); *see also* Kapeles Decl. at ¶¶ 10-16 (Dkt. 74-6).[5]

These are unquestionably legitimate critiques of the AREL Report that Mr. Rush must contend with at trial, alongside the above-referenced factors surrounding his arrest. *See supra* (describing Mr. Rush's mental state and combative nature, that he struck Trooper Weinstein and resisted arrest, that the video – albeit limited – does not support his claims, his lack of complaints following the incident, and conflicting eyewitness testimony).[6] But at this stage of the

---

[5] A separate AREL Report – dated October 26, 2020 – analyzed Mr. Rush's t-shirt and also detected the presence of capsaicinoids (though, oddly, a *different* capsaicinoid) and vanillic acid on its collar. 10/26/20 AREL Rpt. at 3, attached as Ex. C to Bentley Decl. (Dkt. 88-4) ("It is important to note that in the original study, samples taken from the plaintiff's jeans and boxers demonstrated a presence of the compounds nonivamide and vanillic acid. Whereas the recent study samples taken from the plaintiff's shirt demonstrated a presence of vanillic acid and dihydrocapsaicin."). Defendants' expert's January 26, 2021 counter to that later report (added to the record post-hearing) largely tracks his response to the original AREL Report. *See* 1/26/21 Kapeles Rpt. at 3, attached as Ex. B to Kane Aff. (Dkt. 106-2) ("The AREL Additional Analysis Report contains many of the same inconsistencies, factual inaccuracies, and incorrect assumptions in the data and results as the initial AREL analysis."). Therefore, Defendants' supplemental January 26, 2021 does not alter the Court's analysis here.

[6] Additionally, whereas Mr. Rush claims that his groin area was "saturated" with an "orangish-red" dye after being pepper-sprayed (*see* Defs.' SOF Nos. 90-97 (Dkt. 85-2)), the AREL Report paints a different picture. According to the AREL Report, if OC spray "was administered to the Plaintiff's groin region, red staining would occur." 3/16/20 AREL Rpt. at 2, 14. Yet, the AREL Report notes that red "splotches" were only detected on the *outside* of Mr. Rush's pants – importantly, there is no indication whatsoever that red staining existed on either the *inside* of his pants or on his boxer shorts. *Id*. at 2, 9, 14. Though interesting and potentially problematic for Mr. Rush, this apparent fact cannot operate to mean that Mr. Rush was not pepper-sprayed down his pants when the AREL Report's findings themselves remain "consistent with the Plaintiff's claim that the OC spray was administered down his pants aimed at his groin region." *Id*. at 14.

**MEMORANDUM DECISION AND ORDER - 11**

proceedings they succeed only in highlighting the disputes of material fact that preclude summary judgment. At bottom, the record reflects that pepper spray was forensically detected on Mr. Rush's pants and boxer shorts; critically, it does not explain as a matter of law *how* this happened. This case hinges on that unanswered question. Defendants' motion is therefore denied as to this component of Mr. Rush's excessive force/bodily integrity claims.

## B.  Certain Genuine Disputes of Material Fact Necessarily Follow Mr. Rush's First Amendment Retaliation Claim

### 1.  Legal Standard

To state a First Amendment retaliation claim, a plaintiff must allege that "(i) he was engaged in a constitutionally-protected activity; (ii) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (iii) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). A "substantial or motivating factor" can be established through circumstantial evidence by first proving that the official engaging in the alleged retaliatory acts knew of the plaintiff's protected conduct, and second "(i) establish[ing] proximity in time between [the plaintiff's] expressive conduct and the allegedly retaliatory actions; (ii) produc[ing] evidence that the defendants' expressed opposition to [the plaintiff's] speech, either to [the plaintiff] or to others; or (iii) demonstrate[ing] that the defendants' proffered explanations for their adverse actions were false and pretextual." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004). Mere "[s]peculation as to [the defendants'] improper motive does not rise to the level of evidence sufficient to survive summary judgment." *Karam v. City of Burbank*, 352 F.3d 1188, 1193 (9th Cir. 2003).

If the plaintiff meets his initial burden of showing that retaliation was a substantial or motivating factor, the burden shifts to the defendants to establish that they would have made the

**MEMORANDUM DECISION AND ORDER - 12**

same decision even in the absence of the plaintiff's protected conduct. *Hartman v. Moore*, 547 U.S. 250, 260 (2006) (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283-84 (1977)). "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id*. ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."). Typically, the trier-of-fact determines whether the adverse action would have occurred without the protected conduct." *Wagle v. Murray*, 560 F.2d 401, 403 (9th Cir. 1977).

    2.    <u>Analysis</u>

In support of his First Amendment retaliation claim, Mr. Rush alleges that he was harassed and beaten because he took photographs of the scene, including of Specialist Murakami and Trooper Weinstein. His briefing generally identifies three different acts of retaliation that support the claim: (i) Trooper Weinstein's overall behavior in interacting with him while Specialist Murakami investigated the necessity of a mental hold; (ii) the Defendants' conduct in initially pepper-spraying him and taking him to the ground; and (iii) the Defendants conduct in later allegedly pepper-spraying him down his pants. *See generally* Pl.'s Opp. to MSJ at 9-11 (Dkt. 88). Each aspect of the claim is addressed below.

At the outset, individuals have a "First Amendment right to film matters of public interest," which includes law enforcement officers performing their duties. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). Only Specialist Murakami and Trooper Weinstein were aware that Mr. Rush took photographs in the time leading up to his arrest; Trooper Heida was not. As a result, regardless of what Trooper Heida may have done once he arrived on the scene, he could not have retaliated against Mr. Rush *because of* his protected activity. *Cohen v. Fred*

**MEMORANDUM DECISION AND ORDER - 13**

*Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982) (lack of knowledge of a plaintiff's protected activity on the part of the decision-maker "breaks the requisite causal link."). Defendants' motion is therefore granted as to Trooper Heida as to the First Amendment retaliation claim.

Regarding Trooper Weinstein's behavior, Mr. Rush describes the retaliatory conduct as follows:

> An inference can easily be drawn that after Rush started taking pictures with his phone, that it was Weinstein's intention at that point to antagonize Rush – who was in a delusional and paranoid state – to act aggressively, and therefore providing an excuse to violently beat Rush. Indeed, Rush had not committed any crime. He should have been free to leave, and was prepared to do so until Weinstein arrived. Weinstein instead played upon Rush's mental and emotional state, by fumbling with his gun, doing "push-ups" on the car door, taking inappropriate chides at Rush's medical diagnosis, taking Rush's knife and flipping it open in front of his face, glaring at Rush, and so forth – all with an easily inferred intent to get Rush to act.

Pl.'s Opp. to MSJ at 9-10. Assuming all this to be true, it is not clear how, or to what extent, Trooper Weinstein's antagonization of Mr. Rush amounts to retaliation. Said differently, how does antagonizing one to act aggressively *ipso facto* equate to conduct that chills protected conduct? Even if the law permits such an inference, the Court does not interpret such banal conduct in keeping an unstable and agitated Mr. Rush occupied as actually chilling a person of "ordinary firmness" from carrying on with any protected activity. *See* 6/19/18 IRO at 7 (as part of Initial Review Order, Judge Winmill commenting that, if conduct would not chill or silence a person of ordinary firmness from future protected activity, "then 'the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection.'") (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2nd Cir. 2003)). The Court's own review of the interaction between Mr. Rush and Trooper Weinstein confirms as much, such that no reasonable juror could find that Trooper Weinstein retaliated against Mr. Rush in this instance, let alone because of Mr. Rush's photography. Defendants' motion is therefore granted in this respect.

**MEMORANDUM DECISION AND ORDER - 14**

The initial pepper-spraying of Mr. Rush and taking him to the ground is similarly not actionable as an unconstitutional retaliation.  Mr. Rush struck Trooper Weinstein in the face.  Even recognizing that pepper-spraying someone for engaging in protected activity would objectively chill participation in that activity, it is clearly this fact (Mr. Rush hitting Trooper Weinstein) that prompted the split-second reaction to pepper-spray Mr. Rush and subdue his threat.  Such actions were not propelled by any retaliatory impulse or anything other than a duty to enforce the law within the context of the discrete disturbance presented; they existed entirely independent of Mr. Rush ever taking photographs in the first instance.  In this context, a First Amendment retaliation claim cannot stand.  *Hartman*, 547 U.S. at 260.  Defendants' motion is therefore granted in this respect.

Any pepper-spraying down Mr. Rush's pants, however, is a different matter.  If true (a genuine dispute of material fact exists on this point (*see supra*)), its occurrence does not require speculation about improper motives.  Evidence of an improper motive already exists by virtue of the act itself, though a question of fact would persist as to its genesis (either because Mr. Rush hit Trooper Weinstein, because Mr. Rush was taking photographs of Specialist Murakami and Trooper Weinstein earlier, or some other reason).  Further, it cannot be said that such conduct would take place even if Mr. Rush never took the photographs since purposely pepper-spraying someone down their pants and directly onto their bare crotch is blatantly improper under any conceivable scenario.  Viewed in the light most favorable to Mr. Rush, these realities – tethered as they are to his excessive force/bodily integrity claims to begin with – combine to reveal their own genuine disputes of material fact that cannot be resolved as  matter of law.  Defendants' motion is therefore denied in this respect.

**MEMORANDUM DECISION AND ORDER - 15**

## IV.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendants' Renewed Motion for Summary Judgment (Dkt. 85) is GRANTED in part and DENIED in part as follows:

1. As to Plaintiff's Fourth Amendment excessive force/bodily integrity claims:

    a. The evidence does not support Plaintiff's claim that he was beaten as part of his arrest (apart from allegedly being purposely pepper-sprayed on his groin).  Defendants' Motion for Summary Judgment is GRANTED in this respect.

    b. Whether Plaintiff was pepper-sprayed down his pants and on his groin area involves genuine disputes of material fact.  Defendants' Motion for Summary Judgment is DENIED in this respect.

2. As to Plaintiff's First Amendment retaliation claim:

    a. To the extent Plaintiff asserts a First Amendment retaliation claim against Defendant Heida, it is dismissed.  Defendants' Motion for Summary Judgment is GRANTED in this respect.

    b. Defendant Weinstein's behavior leading up to the confrontation with Plaintiff does not support a First Amendment retaliation claim.  Defendants' Motion for Summary Judgment is GRANTED in this respect.

    c. The initial pepper-spraying and taking Plaintiff to the ground (in the moments immediately following Plaintiff striking Defendant Weinstein in the face) do not support a First Amendment retaliation claim.  Defendants' Motion for Summary Judgment is GRANTED in this respect.

    d. Whether Plaintiff was pepper-sprayed down his pants and on his groin area, in addition to the motivation for such conduct (if any), involve genuine disputes of material fact.  Defendants' Motion for Summary Judgment is DENIED in this respect.

**MEMORANDUM DECISION AND ORDER - 16**

IT IS ADDITIONALLY HERBY ORDERED that the parties' August 13, 2021 Stipulation Concerning Discovery (Dkt. 100) is ADOPTED as follows:

1. No additional written discovery between parties is permitted.

2. Subpoenas to third parties pursuant to FRCP 45 shall be issued no later **October 20, 2021**.

3. Depositions shall be scheduled and noticed by **November 4, 2021**. "Scheduled" means that a date has been set for the deposition as agreed to by the parties and the availability of the witness being deposed.

IT IS ADDITIONALLY HEREBY ORDERED that a telephonic status conference is scheduled for October 25, 2021 at 10:00 a.m., at which time the parties shall be prepared to discuss the status of the action, prospects of settlement and related ADR deadline, and a trial setting. Call-in instructions will be provided by separate notice.



DATED: September 20, 2021

_____
Honorable Raymond E. Patricco
U. S. Magistrate Judge

!

**MEMORANDUM DECISION AND ORDER - 17**