# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| CLINTON B. RUSH,<br><br>    Plaintiff,<br><br>vs.<br><br>ANDREW D. WEINSTEIN; DONALD HEIDA;<br>and JANET MURAKAMI,<br><br>    Defendants. | Case No.: 1:18-cv-00073-REP<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**PLAINTIFF'S MOTION TO EXCLUDE OR ALTERNATIVELY LIMIT THE TESTIMONY OF DEFENDANTS' EXPERT JOHN KAPELES (Dkt. 119)**<br><br>**PLAINTIFF'S MOTION IN LIMINE, SANCTIONS FOR SPOLIATION OF EVIDENCE, AND PROPOSED JURY INSTRUCTIONS (Dkt. 125)**<br><br>**PLAINTIFF'S SECOND MOTION IN LIMINE (Dkt. 141)**<br><br>**DEFENDANTS' MOTION IN LIMINE (REPORTS/DECLARATIONS) (Dkt. 139**<br><br>**DEFENDANTS' MOTION IN LIMINE (NEW YORK TIMES ARTICLE) (Dkt. 140)** |

Pending before the Court are the following motions:  (i) Plaintiff's Motion to Exclude or Alternatively Limit the Testimony of Defendants' Expert John Kapeles (Dkt. 119); (ii) Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and Proposed Jury Instructions (Dkt. 125); (iii) Plaintiff's Second Motion in Limine (Dkt. 141); (iv) Defendants' Motion in Limine (Reports/Declarations) (Dkt. 139); and (v) Defendants' Motion in Limine (New York Times Article) (Dkt. 140).  Having carefully considered the record, participated in oral argument, and

**MEMORANDUM DECISION AND ORDER - 1**

otherwise being fully advised, the Court enters the following Memorandum Decision and Order, memorializing for the parties' benefit the Court's synthesis and resolution of the issues raised during the April 12, 2022 pre-trial conference.

## BACKGROUND[1]

On February 14, 2018, Plaintiff Clinton Rush filed a lawsuit against Defendants Andrew Weinstein, Donald Heida, and Janet Murakami (three Idaho State Police Officers), claiming that they used excessive force when they arrested him.  Plaintiff alleges that, as part of an October 4, 2017 encounter at the East Boise Port of Entry ("POE"), at least one Defendant purposely pepper-sprayed him down his pants and on his groin.

Plaintiff's claims against Defendants are brought under 42 U.S.C. § 1983, the civil rights statute.  He alleges that Defendants, acting under color of state law, deprived him of his rights under the Fourth Amendment (excessive force/bodily integrity claim) and the First Amendment (retaliation claim) when "they" pepper-sprayed him in the groin preceding his eventual arrest.

## LEGAL STANDARDS

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  There is no express authority for motions in limine in either the Federal Rules of Civil Procedure or the Federal Rules of Evidence.  *But see* Fed. R. Evid. 104(a).  Nevertheless, these motions are well-recognized in practice and by case law.  *See, e.g.*, *Ohler v. United States*, 529 U.S. 753, 758 (2000).  The key function of a motion in limine is to "exclude prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 (1984).

---

[1]  The background of the case is stated with brevity, as it is already well-known to the parties and the Court.  For the sake of completeness, a more thorough discussion of the background can be found within the Court's September 20, 2021 Memorandum Decision and Order.  *See* 9/20/21 MDO (Dkt. 110).

Judges have broad discretion in ruling on motions in limine.  *See United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) (motion in limine rulings reviewed for abuse of discretion). Moreover, such rulings are provisional and "not binding on the trial judge."  *Ohler*, 529 U.S. at 758, n.3.  It is sometimes necessary to defer ruling until trial when a better estimate of the impact of the evidence on the jury can be made by the trial judge.  *See Crawford v. City of Bakersfield*, 2016 WL 5870209, at *2 (E.D. Cal. 2016).  Generally, motions in limine excluding broad categories of evidence are disfavored, as such issues are more fairly dealt with during trial as the admissibility of evidence arises.  *See Sperberg v. Goodyear Tire & Rubber, Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

Denial of a motion in limine does not mean that all evidence contemplated by the motion will be admitted at trial.  Instead, denial of such a motion simply means the Court is unable to determine whether the evidence should be excluded outside of the trial context.  At trial, the parties may object to the offering of evidence even though such evidence was the subject of the Court's denial of a motion in limine.  Where a motion in limine is granted, however, the parties are precluded from arguing, discussing, or offering the particular evidence that the Court has ordered be excluded unless the Court rules otherwise during the course of the trial.

As is typical with motions in limine generally, here, aspects of the parties' motions in limine involve challenges to relevance under Federal Rule of Evidence ("FRE") 401 and unfair prejudice under FRE 403.  FRE 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "[R]elevance is a very low threshold to overcome in determining the admissibility of evidence."  *Taylor v. Shippers Transport Exp., Inc.*, 2014 WL 7499046, at *3 (C.D. Cal. 2014).  Irrelevant evidence is inadmissible.  *See* Fed. R. Evid. 402.

**MEMORANDUM DECISION AND ORDER - 3**

FRE 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Importantly, Rule 403 is not designed to exclude all prejudicial evidence, only "unfairly" prejudicial evidence that is substantially outweighed by its probative value.  *See United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).  "[T]he application of Rule 403 must be cautious and sparing.  Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  *Id*.  Evidence is unfairly prejudicial when it has an "'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id*. (quoting Adv. Comm. Notes to Fed. R. Evid. 403).  The balancing of the unfair prejudice and probative value lies within the court's discretion.  *See United States v. Larios*, 640 F.2d 938, 941 (9th Cir. 1981).

## DISCUSSION

**A.    Plaintiff's Motion to Exclude or Alternatively Limit the Testimony of Defendants' Expert John Kapeles (Dkt. 119)**

Plaintiff moves to exclude the testimony of Defendants' expert witness, John Kapeles, because (i) his testimony at trial will relate to contents of a pepper spray not manufactured by his company (Safariland LLC); (ii) he did not forensically analyze Plaintiff's clothing himself; and (iii) his opinions lack foundation and are unreliable as required by FRE 702.  *See generally* Pl.'s Mem. ISO Mot. to Exclude (Dkt. 119-1).[2]  Defendants disagree, arguing that Mr. Kapeles is qualified to render an expert opinion on Plaintiff's experts' pepper spray analyses, that his

---

[2]  Plaintiff alternatively argues that Mr. Kapeles's testimony "should be limited to the narrow portions of his testimony that could be reliable and non-prejudicial."  Pl.'s Mem. ISO Mot. to Exclude at 2 (Dkt. 119-1).  Plaintiff, however, does not identify any such testimony.

opinions are properly supported and reliable, and that the Court should allow him to testify to matters within his expertise.  *See generally* Defs.' Resp. to Pl.'s Mot. to Exclude (Dkt. 120).  For the reasons explained below, the Court will largely deny Plaintiff's Motion, but nonetheless limit Mr. Kapeles's testimony at trial.

       1.    <u>Expert Testimony Standard</u>

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires that retained expert witnesses must provide a written report that contains (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications; (v) a list of other cases in which the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.  Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi).  Failure to disclose or supplement as required under Rule 26(a) may result in exclusion of that information or witness at trial unless the failure was substantially justified.  Fed. R. Civ. P. 37(c)(1).

Under FRE 702, a qualified witness with specialized knowledge helpful to the jury may offer expert testimony where: (i) the opinion is based upon sufficient facts or data; (ii) the opinion is the product of reliable principles and methods; and (iii) the witness has applied those principles and methods reliably to the facts of the case.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court acts as a gatekeeper to "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quotation marks and citation omitted).  In doing so, the Court's analysis focuses "solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at

**MEMORANDUM DECISION AND ORDER - 5**

595.  The Court's "task . . . is to analyze not what the experts say, but what basis they have for

saying it."  *Wendell v. GlaxcoSmithKlein LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)).  Challenges

going to the weight of the evidence and credibility determinations are reserved for the finder of

fact.  *City of Pomona v. SQMN. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

> 2.   <u>Mr. Kapeles is Qualified to Testify About the Components of the Pepper Spray
> Defendants Claimed to Possess and/or Used the Day of Plaintiff's Arrest, as Well
> as Critique the Pepper Spray Analyses Proffered by Plaintiff's Experts</u>

Mr. Kapeles is a chemical engineer who, for the past 18 years, had primary responsibility

for the development of the Less Lethal product line at Safariland; he directs development,

manufacturing, and testing of aerosol defense spray formulations containing Oleoresin Capsicum

("OC"),[3] to include different active ingredients, solvents, and propellant systems.  Kapeles Aff.

at ¶¶ 2-4 (Dkt. 74-6).  Plaintiff does not seriously challenge Mr. Kapeles's professional

qualifications – he clearly is an expert on the chemical composition of pepper sprays generally

and the propulsion systems used to deploy them.

To this end, Mr. Kapeles plans to testify concerning the ingredients contained in the MK-

3 First Defense aerosol spray (Lot# OC940, MFG 2014), manufactured by Safariland.  *See* Defs.'

Expert Discl. (Dkt. 106-2).  He will testify to the MK-3 pepper spray specifically because he

understands that Defendant Murakami utilized and deployed this pepper spray the day Plaintiff

was arrested.  Kapeles Aff. at ¶ 6 (Dkt. 74-6); Kapeles Aff. at ¶ 8 (Dkt. 89-1) (same as to all

Defendants).  To the extent Plaintiff questions Mr. Kapeles's ability to testify about the MK-3

pepper spray owing to Plaintiff's contemporaneous spoliation-related arguments relating to the

alleged destruction of the Defendants' pepper spray cannisters, that argument is rejected for the

---

[3]  The Court uses the terms "OC spray" and "pepper spray" synonymously.  *See* 9/20/21
MDO at 9, n.4 (Dkt. 110) (describing capsaicinoid compounds within OC/pepper spray).

**MEMORANDUM DECISION AND ORDER - 6**

reasons discussed later in this Memorandum Decision and Order.  *See infra* (addressing claim that Defendants failed to preserve and destroyed the pepper spray cannisters they possessed on October 4, 2017).  To be clear, Mr. Kapeles is qualified to testify about the MK-3 pepper spray and its chemical composition.[4]

Mr. Kapeles also plans to critique Plaintiff's experts' two reports (the "AREL Reports").  *See* Defs.' Expert Discl. (Dkt. 106-2).  Interestingly, the AREL reports suggest the presence of different capsaicinoids (and irregular red staining) between Plaintiff's t-shirt and his pants/boxers.  *See* 9/20/21 MDO at 11, at n.5 (Dkt. 110).  Much ground has been covered as to these discrepancies and what it may mean for Plaintiff's case.  For his part, Mr. Kapeles criticizes the analyses used by Plaintiff's experts in the AREL Reports and the ultimate conclusions derived therefrom.  His expertise generally allows him to do this.  That is, with respect to the AREL Reports, Mr. Kapeles may testify to (i) technical discrepancies (nomenclature-related) in the chemical composition of pepper sprays generally, and the MK-3 product specifically; (ii) the claimed-association between red "splotches" on Plaintiff's pants and any corresponding administration of pepper spray thereon; (iii) inconsistencies between the composition of capsaicinoids found in Plaintiff's clothing and the pepper spray allegedly used by Defendants; and (iv) selective reliance on incomplete data points to draw inferences, specifically

---

[4]  Plaintiff seems to acknowledge as much by stating:  "Here, at best Mr. Kapeles has disclosed only two findings for which he may have expertise:  (i) that a capsaicinoid *contained in the MK-3 sprays* was found on Mr. Rush's shirt and that the shirt was not discolored; and (ii) that none *of the components contained in the MK-3 spray* was on Mr. Rush's jeans or boxers and the discoloration was not the result of an MK-3 spray."  Pl.'s Mem. ISO Mot. to Exclude at 16-17 (Dkt. 119-1) (emphasis added).  Even so, the Court notes that the identifying characteristics of Defendant Heida's pepper spray cannister (e.g., its lot number and manufacturing date) appear to be scratched away and completely illegible.  *See* Heida Second Aff. (Dkt. 89-3) (attaching photographs of his pepper spray cannister).  Therefore, unless additional foundation is laid to establish a uniformity in MK-3 products, Mr. Kapeles will not be able to opine on the chemical components of all of Defendants' pepper spray cannisters at once.  This circumstance is also subject to Plaintiff's cross-examination.

**MEMORANDUM DECISION AND ORDER - 7**

concentrations of compounds on selected areas of Plaintiff's pants and boxers. *See generally* 9/25/20 Kapeles Rpt. at 3-14, attached as Ex. B to Kapeles Decl. (Dkt. 74-6); *see also* Kapeles Decl. at ¶¶ 10-16 (Dkt. 74-6); 1/26/21 Kapeles Rpt. at 3, attached as Ex. B to Kane Aff. (Dkt. 106-2); *but see supra* (discussing limitations to Mr. Kapeles's anticipated testimony).

But these opinions are not without their own sets of questions. For example, Plaintiff appropriately points out that Mr. Kapeles's opinions about the break-down of capsaicinoids found in pepper spray – nonivamide, in particular – are arguably at odds with the scientific literature. Pl.'s Mem. ISO Mot. to Exclude at 10-13 (Dkt. 119-1). To this point, Plaintiff relatedly highlights the inconsistency in any of Mr. Kapeles's opinions that attempt on the one hand to differentiate the MK-3 pepper spray from the pepper spray identified on Plaintiff's pants and boxers, while on the other hand discussing how the MK-3 pepper spray detected on Plaintiff's shirt could have still been transferred to his pants and boxers. *Id.* at 15-19. These incongruities – if any can be accurately described as such – are best explored and exposed during cross-examination; they do not operate to exclude their discussion at the outset. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion.").

3.   <u>Mr. Kapeles May Not Testify About the Genesis of Any Pepper Spray Detected on Plaintiff's Pants and Boxers or That No Pepper Spray Could Have Been Deployed Down Plaintiff's Pants and Boxers</u>

Notwithstanding Mr. Kapeles's qualifications, it is undisputed that he never engaged in any actual analysis that would explain (i) how legitimately-deployed pepper spray aimed at his upper body could have *ended up on and inside* Plaintiff's pants (by, for instance, a spray plume test that takes into account spray volume, duration, distance, atmospheric conditions, and Plaintiff's clothing), or, for that matter, (ii) how residue from the detected pepper spray on Plaintiff's t-shirt (or the ground) could have *migrated* to Plaintiff's pants and inside them on his

boxers (whether by a combination of fluid dynamics, cross-contamination, the textile properties of Plaintiff's clothing, or some other scientific explanation).  Mr. Kapeles is therefore not permitted to speculate on such matters at trial given the strength of the imprimatur that attaches to expert testimony; such speculation would not be "helpful" to the jury and would invade their province as the fact-finder.  Defendants' counsel may still make these common-sense arguments to the jury for them to consider and resolve.

For similar reasons, it would be improper for Mr. Kapeles to opine at trial that Plaintiff was not pepper-sprayed with a cannister directed *down his pants*.  *See, e.g.*, Kapeles Rpt. at 5, attached as Ex. A to Kapeles Second Aff. (Dkt. 89-1) ("The more correct statement would be that 'the report submitted by AREL cannot with a reasonable degree of certainty be used to support a claim that Plaintiff had this particular OC spray (MK-3 First Defense aerosol spray), *or any OC spray*, deployed down his pants.'") (emphasis in original); *see also id*. at 9 (same).  Again, Defendants' counsel may cobble the admitted evidence into such an argument at trial, but Mr. Kapeles himself, as an expert, cannot take such a stand.

In sum, Mr. Kapeles is not precluded from testifying at trial.  However, his opinions (i) about alternate explanations for how properly-deployed pepper spray directed at his upper body could still be detected within Plaintiff's pants and boxers, and (ii) that no pepper spray could have been deployed by a cannister directed down Plaintiff's pants, are inadmissible.  They are not the product of reliable principles and methods, and are not helpful to the jury.[5]

Plaintiff's Motion to Exclude or Alternatively Limit the Testimony of Defendants' Expert John Kapeles (Dkt. 119) is granted, in part, and denied, in part.

---

[5]  Though there is no pending motion on the matter, these improper expert opinions on the ultimate issues apply equally to Plaintiff's experts, given their own areas of expertise and extent of analyses.

**MEMORANDUM DECISION AND ORDER - 9**

**B.     Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and Proposed Jury Instructions (Dkt. 125)**

Plaintiff moves to preclude Defendants from making any argument or reference to his mental illness at trial, while also seeking sanctions for Defendants' alleged spoliation of (i) the pepper spray cannisters in their possession when Plaintiff was arrested and (ii) the video records from the Ada County Jail that day.  Pl.'s MIL and Spoliation (Dkt. 125).  These arguments are addressed in turn.

1.     Plaintiff's Mental Illness

Plaintiff moves to prevent Defendants from testifying themselves that his excessive force and retaliation allegations are the product of his mental illness (schizophrenia).  Pl.'s Mem. ISO MIL and Spoliation at 17-18 (Dkt. 125-1).  Plaintiff also moves broadly to exclude any cross-examination about his mental illness under FRE 403 because "any probative value of allowing an examination of [Plaintiff] pertaining to his mental illness will be far outweighed by the unfair prejudicial effect to [him]" and "will also likely consume the trial."  *Id*. at 18-21.

At the outset, Plaintiff has acknowledged in his deposition and briefing to date that, on the day of the events giving rise to this action, he was in a delusional state.  *See, e.g.*, *id*. at 21 (Plaintiff admitting that "he was suffering delusional symptoms" and that "witnesses to the incident witnessed [his] delusional behavior").  Plaintiff's delusions are relevant, in the first instance, to show why Defendants were summoned to the scene and why they initially detained Plaintiff.  Accordingly, as percipient lay witnesses, Defendants may testify to their observations that day, including what Plaintiff did and said.  *See* FRE 801(d)(2) (out-of-court statements by opposing party are not hearsay).  They may also testify to the actions they took in response to what they saw and heard.  But Defendants may not independently attribute Plaintiff's conduct or statements to any mental illness; they are simply not qualified to draw such a conclusion.  *See,*

**MEMORANDUM DECISION AND ORDER - 10**

*e.g.*, *Frisone v. United States*, 270 F.2d 401, 403 (9th Cir. 1959) (existence or treatment of mental illness "falls clearly outside the area of common knowledge and within the area where expert testimony is required."); *Lawson v. Lawson*, 2015 WL 5474763, at *2 (D. Nev. 2015) ("[A] lay witness . . . cannot express a medical diagnosis or causation unless it is within the usual and ordinary experience of a lay person.").

Defendants may also cross-examine Plaintiff about his mental illness where it manifested during the day of the events at issue and how his symptoms affected his ability to perceive and recall. Fed. R. Evid. 611(b). Generally, a witness's "severe" mental illness that "dramatically impair[s] his ability to perceive" may be used to impeach that witness. *Gonzalez v. Wong*, 667 F.3d 965, 983 (9th Cir. 2011); *see also* Fed. R. Evid. 608(b); *United States v. Kohring*, 637 F.3d 895, 910-11 (9th Cir. 2011) (explaining that evidence of a witness's psychological history may be admissible if the witness's condition "may have affected her ability to perceive or to recall events or to testify accurately") (quoting *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995) (referencing the following factors when assessing probative value of witness's mental condition: "the nature of the psychological problem, . . . the temporal recency or remoteness of the history, . . . and whether the witness suffered from the problem at the time of the events to which she is to testify")).

At bottom, Plaintiff's mental illness is relevant to his ability to perceive and recall the events giving rise to the instant dispute. However, this evidence is subject to FRE 403's balancing considerations. *Gratuitous or cumulative references to Plaintiff's mental illness for the purpose of generally attacking his credibility or competency will not be permitted.* Additionally, Defendants will not be permitted to reference Plaintiff's mental illness unless and until Plaintiff testifies. Consistent with Rule 611(b), should Plaintiff testify, Defendants may inquire about Plaintiff's mental illness (and the delusional state it may have caused on the date of

**MEMORANDUM DECISION AND ORDER - 11**

the events in question) to impeach Plaintiff on his ability to perceive and recall those events.

Should Plaintiff deny his mental illness or delusional state, Defendants may introduce extrinsic

evidence, in the form of medical records, as impeachment.

In this respect, Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and

Proposed Jury Instructions (Dkt. 125) is granted, in part, and denied, in part.

2.      Pepper Spray Cannisters, Ada County Jail Video Records, and Spoliation

This case is straightforward; it turns on whether some or all of Defendants deliberately

directed pepper spray down Plaintiff's pants and on his groin.  To answer this question, Plaintiff

contends that Defendants' pepper spray cannisters and the video records from the Ada County

Jail in the immediate aftermath of his arrest are integral to his claims.  Pl.'s Mem. ISO MIL and

Spoliation at 2-4, 10-16 (Dkt. 125-1).  But, according to Plaintiff, these relevant items of

evidence were never preserved for inspection and/or testing and, as a result, warrants sanctions

for spoliation.  *Id.*  The Court disagrees.

a.      *Spoliation Standard*

"Spoliation of evidence is the destruction or significant alteration of evidence, or the

failure to properly preserve property for another's use as evidence in pending or reasonably

foreseeable litigation."  *Balla v. Idaho State Bd. of Corr.*, 119 F. Supp. 3d 1271, 1282 (D. Idaho

2015).  Federal trial courts have the "inherent discretionary power to make appropriate

evidentiary rulings in response to destruction or spoliation of relevant evidence."  *Glover v. BIC

Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

There is no precise standard for determining when spoliation sanctions are appropriate,

but "the majority of trial courts have adopted the following test: (i) the party having control over

the evidence had an obligation to preserve it at the time it was destroyed; (ii) the [evidence]

wa[s] destroyed with a culpable state of mind; and (iii) the evidence was relevant to the party's

**MEMORANDUM DECISION AND ORDER - 12**

claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Bell v. City of Boise*, 2015 WL 13778741, at *2 (D. Idaho 2015). The party seeking spoliation sanctions has the burden of establishing the elements. *Id*.

Courts may sanction parties for destruction of evidence in three ways. "First, a court can instruct the jury that it may draw an inference adverse to the party or witness responsible for destroying the evidence. Second, a court can exclude witness testimony proffered by the party responsible for destroying the evidence and based on that destroyed evidence. Finally, a court may dismiss the claim of the party destroying the evidence." *In re Napster Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (internal citations omitted).

A finding of bad faith is not a prerequisite to issuing sanctions. Courts may issue sanctions against a party who merely had notice that the destroyed evidence was potentially relevant. *Glover*, 6 F.3d at 1329. A party's motive or degree of fault in destroying the evidence is relevant to what sanction, if any, is imposed. *Napster*, 462 F. Supp. 2d at 1067.

       *b.*    *Pepper Spray Cannisters*

Plaintiff argues that "Defendants should be excluded from introducing any testimony or evidence pertaining to the brand and type of [pepper] spray in their possession and used on the day of [his] arrest . . . ." Pl.'s Mem. ISO MIL and Spoliation at 10 (Dkt. 125-1). His entire argument is premised upon the claim that Defendants "did not fulfill their explicit duties to preserve certain evidence *and in fact destroyed evidence*." *Id*. (emphasis added). Except Defendants *did* preserve their pepper spray cannisters.

Each Defendant has testified that they preserved the pepper spray cannisters following Plaintiff's arrest. *See* Murakami Aff. at ¶ 38 (Dkt. 74-5) ("After the encounter with Mr. Rush, I retained the OC spray container in my possession, but did not use the cannister again for any purpose. When I learned of Mr. Rush's experts' opinions about the OC spray, I photographed

**MEMORANDUM DECISION AND ORDER - 13**

the OC cannister and forwarded the photos to my attorney.  I have reviewed the report of John

Kapeles, an engineer at Safariland, the manufacturer of the OC spray, and can say that the

photographs of the pepper spray cannister (Figures 1 and 2) are the ones I forwarded of the OC

cannister in my possession.  I turned the cannister over to the ISP legal department for

safekeeping.”); Weinstein Second Aff. at ¶ 5 (Dkt. 89-2) (“Attached to this affidavit are

photographs of the OC/pepper spray which I had in my possession on October [4,] 2017.  This

cannister has continuously remained in my possession.”); Heida Second Aff. at ¶ 5 (Dkt. 89-3)

(same); Kane Aff. at ¶ 27 (Dkt. 136-1) (“Plaintiff claims there are no cannisters, but there are

photos of all three and two still exist.”).[6]  To be sure, photographs of these pepper spray

cannisters were included within Defendants’ summary judgment briefing as part of their

incorporation within Defendants’ expert’s reports.[7]

Despite this, Defendants argue that Plaintiff never actually requested that Defendants

produce their pepper spray cannisters.  *See* Kane Aff. at ¶ 6, 27 (Dkt. 136-1).[8]  Setting aside the

---

[6]  Though Defendant Heida’s pepper spray had been retained initially, it is now
apparently missing.  *See* Kane Aff. at ¶ 26 (Dkt. 136-1) (“Officer Heida is no longer with ISP,
but I understand that he did give his OC/pepper spray to ISP personnel.  That appears to have
been discarded.”); Srodawa Aff. at ¶¶ 4-5 (Dkt. 136-3) (same).

[7]  Defendants’ October 9, 2020 Motion for Summary Judgment included Defendant
Murakami’s Affidavit.  Defendants’ February 26, 2021 reply in support of their renewed Motion
for Summary Judgment included Defendant Weinstein’s and Defendant Heida’s Affidavits.

[8]  During the April 12, 2022 pre-trial conference, Plaintiff’s counsel suggested that
Plaintiff’s Request for Production No. 17 operated to request Defendants’ pepper spray
cannisters.  The Court disagrees.  Request No. 17 reads: “The Defendants, Officers Weinstein,
Heida, and Murakami’s, investigative stop, as more fully described in Interrogatory No. 17.”
*See, e.g.*, Def. Murakami’s Resp. to Pl.’s First Set of Discovery, attached as Ex. M. to Olsen
Decl. (Dkt. 125-5).  Interrogatory No. 17 reads: “If you made an investigative, *Terry* stop of the
Plaintiff prior to initiating his arrest, what observations did you make; what information did you
possess; and what facts did you rely on to make the stop?”  *Id.*  The Court’s separate review of
Request for Production No. 18 also comes up short.  Request for Production No. 18 reads in part:
“The Defendants, Officers Weinstein, Heida, and Murakami’s, response to Request Nos. 14
through 25 should include, but not be limited to, arrest, prosecution, incident, use of service

fact that the pepper spray cannisters were apparently preserved (and thus not destroyed), there can be no prejudice to Plaintiff that would justify sanctions if the spray cannisters were never formally requested to begin with or followed up on.  *See, e.g.*, *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 25 (S.D.N.Y. 2010) ("Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, *or that during discovery they never asked for the evidence later shown to have been spoliated*.") (emphasis added).[9]

In short, Defendants are permitted to testify about their conduct on October 4, 2017 and the pepper spray they claim to have used and its chain of custody.  This testimony is subject to cross-examination.  Likewise, Defendants' expert can testify about the brand Safariland manufactures and sells to law enforcement agencies, as well as what pepper spray he understands the officers used that day.  *See supra*.  Because (i) Defendants preserved the pepper spray cannisters, (ii) Plaintiff did not specifically request the production of the pepper spray cannisters during discovery, and (iii) Plaintiff was aware of the existence of the pepper spray cannisters through Defendants' briefing, there is no prejudice that would support a spoliation-related sanction.

---

weapon, injury, evidence, weapons, examination and testing, property, and supervisors' and shift commanders' reports; audio, video, and surveillance tapes; notes; witness statements, measurements; diagrams; emails; text messages; press releases; summaries; recommendations, and conclusions; and where and in what form this information is stored and maintained."  *Id.*

[9] Addressing any Rule 26 concern, Defendants have always conceded that Defendant Murakami deployed her pepper spray on October 4, 2017.  Defs.' Resp. to Pl.'s MIL and Spoliation at 7 (Dkt. 136).  To the extent any disclosure obligation arose by virtue of Plaintiff's evolving theory of the case, the pepper sprays' existence became known to Plaintiff via Defendants' summary judgment briefing (*see supra*).  *Id.* at 8 ("Defendants believe that the cannisters were timely disclosed and they should not be penalized for failing to supplement the Initial Disclosure in this case by reminding Plaintiff the ISP officers had pepper spray cannisters in their possession on October 4, 2017.").  Yet, during discovery, Plaintiff made no specific request for production of the pepper spray cannisters.

**MEMORANDUM DECISION AND ORDER - 15**

Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and Proposed Jury Instructions (Dkt. 125) is denied in this respect.

            *b.*     *Ada County Jail Video Records*

Unlike the pepper spray cannisters, it is undisputed that there is no video recording of Plaintiff's booking at the Ada County Jail.  Plaintiff argues that the video recording "would have contained potentially-relevant information pertaining to [his] claim" and, as such, the failure to preserve it amounts to sanctionable spoliation.  Pl.'s MIL and Spoliation at 12-16 (Dkt. 125-1).[10] The Court disagrees.

First, there is a question about whether any such recording even existed (as distinct from a recording in existence that was overwritten).  This is because, while there are understandably video cameras in place at the Ada County Jail (including in, or directed at, some or all of the "holding cells"), internal policies also understandably prohibited the video taping of inmates in states of undress.  Plaintiff is therefore left to speculate twice: initially about the existence of a recording at any point in time, and then that any such recording would have captured and corroborated his version of the events that day, namely showing the presence of red splotches on his pants and boxers, and on his skin in his groin area.

Second, even when assuming the existence of a video recording, the Ada County Jail employed a procedure to overwrite them in time – here, 90 days – unless there was a request to preserve them.  *See* Lloyd Aff. at ¶ 3(Dkt. 89-4) ("In 2017, all recordings were stored for 90 days, unless Ada County Sheriff is notified to retain the recordings.  If such notice is not filed, recordings are overwritten, resulting in destruction of the underlying recording.").  And, while

---

[10] As to *this* action, the Court understands Plaintiff's argument to be that any video from the Ada County Jail would somehow show that he was pepper-sprayed down his pants (presumably as a result of the alleged red/orange dye contained in the pepper spray) when he undressed and changed clothes.

**MEMORANDUM DECISION AND ORDER - 16**

there was a Notice of Tort Claim filed within 90 days, it made no mention of Plaintiff being pepper-sprayed down his pants. *See* Ex. A to Kane Aff. (Dkt. 136-1). Similarly, Plaintiff's Complaint was filed on February 14, 2018 (133 days after Plaintiff's arrest and booking) and a document hold was only formally in place as of October 16, 2018 (more than a year after Plaintiff's arrest and booking). In other words, the Ada County Jail was not on notice of a duty to preserve any video recordings in its possession until after such a video (if it ever existed) had already been overwritten pursuant to policy.

Plaintiff's November 17, 2017 Prison Rape Elimination Act ("PREA") interview is a different matter, but not dispositively so. There, and for the first time since his arrest, Plaintiff claimed to an ISP investigation team (not Ada County Jail employees) that he was actually pepper-sprayed down his pants. *See* Ex. H to Olsen Decl. (Dkt. 125-5) ("And that while I'm restrained, he pulls out mace and sprays mace down my pants. . . . You know, because he couldn't spray me with mace because there was already three or two other officers right there. And I think that's why he got mad he couldn't spray with mace. So he just tried to spray down my pants."). But importantly, these allegations alone would not have prompted the ISP investigators to "connect the dots" between the events at the arrest scene earlier in the day and after-the-fact video recordings at the jail. Even if ISP investigators were aware that such video recordings existed at the jail, it is unreasonable for them to have foreseen (i) that such recordings would have been taken of Plaintiff undressed (against Ada County Jail policy); or (ii) that there would have been any visible evidence of the pepper-spraying on Plaintiff's skin. Any unifying thread that possibly exists with the benefit of hindsight was simply nonexistent at that point in time.

Third, as a practical matter, Defendants had no control over video recordings at the Ada County Jail. There is little Ninth Circuit authority considering whether and under what

**MEMORANDUM DECISION AND ORDER - 17**

circumstances spoliation of evidence may be imputed to a defendant who did not participate in the spoliation. *See Pettit v. Smith*, 45 F. Supp. 3d 1099, 1110 (D. Ariz. 2014) (discussing authorities). The current trend among district courts appears to be to impute liability for an agent's spoliation to the principal "based on traditional notions of agency law, in which a defendant principal exercises control and authority over its third-party agent who possesses the spoliated evidence." *Dykes v. BNSF Ry. Co.*, 2019 WL 1128521, at *6 (W.D. Wash. 2019). Here, Defendants were state employees; they were not agents of the Ada County Jail. To that end, Ada County did not exercise any control or authority over Defendants. Additionally, there is no evidence that the Ada County Jail is providing Defendants' legal defense or indemnifying them in this litigation. *See Pettit*, 45 F. Supp. 3d at 1106 Therefore, without more, the Ada County Jail's conduct – how ever that may be characterized – is that of a disinterested third-party and will not be imputed to Defendants.

With all this in mind, the parties' various accounts about whether any recording existed and/or should have been preserved is subject to cross-examination.[11] In the meantime, there is no basis to find either that spoliation existed or that Defendants should be sanctioned for it.

Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and Proposed Jury Instructions (Dkt. 125) is denied in this respect.

## C.    Plaintiff's Second Motion in Limine (Dkt. 141)

Plaintiff moves to prevent Defendants from offering the following "evidence or facts" at trial: (i) documents produced by Defendants within their "Second Supplement to Defendants'

---

[11] This includes Plaintiff's allegations that certain Defendants turned off their "dashcam" or "body-cam" audio during and/or after Plaintiff's arrest. *See* Pl.'s Mem. ISO MIL and Spoliation at 14 (Dkt. 125-1) ("Such bad conduct begins at the very outset of Defendants' engagement with Rush, when Andrew Weinstein . . . purposely shut off his body audio recording device and thus, intentionally failed to record his interactions with Rush and other individuals. The bad acts continue from there . . . .").

**MEMORANDUM DECISION AND ORDER - 18**

Initial Disclosures" and labeled as DEFS-186-742; (ii) Plaintiff's criminal history; and (iii) Plaintiff's video deposition.  Pl.'s Second MIL (Dkt. 141).  Each of these arguments is addressed in turn.

       1.      <u>Documents Labeled as DEFS-186-742</u>

On March 14, 2022, Defendants served their Second Supplement to Defendants' Initial Disclosures pursuant to Rule 26(a)(1).  *See* Ex. A to Olsen Decl. (Dkt. 141-1).  Among this supplement were two categories of documents:  (i) "Documents subpoenaed from Ada County (DEFS-186 through DEFS-468"); and (ii) "Documents pertaining to Plaintiff's criminal conviction (DEFS-469 through DEFS-742)."  *Id*. at 2-3.  Plaintiff claims that the "production of such documents at this late date is inexcusable and extremely prejudicial" to him.  Pl.'s Second MIL at 2 (Dkt. 141).  He seeks to prevent these documents from being admitted into evidence at the upcoming trial.  *Id*. at 1.

Defendants' response reveals that the overwhelming majority of the 557 pages of at-issue documents (everything but six pages from Plaintiff's criminal file)[12] are already in Plaintiff's possession and that their supplement simply assigned bates-stamped numbers to those documents for convenience and easy identification at trial.  *See generally* Defs.' Resp. to Pl.'s Second MIL at 2-6 (Dkt. 143).  Plaintiff does not ultimately dispute that he already had all but the missing six pages of documents, except to argue that Defendants' supplement did not comply with their duty to timely supplement their initial disclosures under Rule 26.  Pl.'s Reply ISO Second MIL at 1 (Dkt. 147) ("[T]he standard is not whether either or both parties happen to have the same

---

[12]   Defendants identify the six pages as follows:  "DEFS 525-526 is a copy of a Request for Discovery made by Plaintiff's public defender; DEFS 558-559 is a *pro se* request from the Plaintiff in his criminal matter to release audio/videos taken by the ISP officers on October 4, 2017; while DEFS 566-567 is a copy of court minutes of a pretrial conference held on May 1, 2018."  Defs.' Resp. to Pl.'s Second MIL at 5 (Dkt. 143).  Defendants do not intend to use these six pages at trial.  *Id*.

**MEMORANDUM DECISION AND ORDER - 19**

documents, but whether such documents have been disclosed that will 'support claims and defenses.'") (quoting Fed. R. Civ. P. 26(a)(1)(A)(ii)).  This argument overstates the duty to supplement.

Rule 26(e) requires supplementation "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ."  Fed. R. Civ. P. 26(e)(1)(A).  Here, Defendants were not aware that any production up to that point (from third parties to Plaintiff) may have technically been incomplete.  Defs.' Resp. to Pl.'s Second MIL at 5 (Dkt. 143) ("Defendants do not know why the documents obtained by the Plaintiff form the prosecutor did not include these six (6) pages (assuming they were not in fact actually produced to the Plaintiff).").  But more to the point, Plaintiff was already aware of all but six pages of these documents.  In this setting, only the six pages of documents that were never produced to Plaintiff before March 14, 2022 will be excluded at trial.

Plaintiff's Second Motion in Limine is granted in only this very limited respect.

2.    Plaintiff's Criminal History

Pointing to the admittedly-limited issues involved in the case (excessive force and retaliation), Plaintiff argues that his criminal history should be excluded because it is irrelevant under FRE 401 and would cause unfair prejudice regardless as contemplated by FRE 403.  Pl.'s Second MIL at 3 (Dkt. 141).  Defendants generally agree, stating that "Plaintiff's conviction would normally have no place in a civil trial concerning whether use of excessive force occurred."  Defs.' Resp. to Pl.'s Second MIL at 6 (Dkt. 143).  However, Defendants submit that, *if* Plaintiff is permitted to discuss his claim that law enforcement planted drugs on him at the jail (*after* the circumstances surrounding the alleged excessive force and retaliation occurred), they

**MEMORANDUM DECISION AND ORDER - 20**

*then* have the right to question Plaintiff about his guilty plea to possession of the "planted" drugs. *Id*. at 6-7.  Neither party fully captures the Motion's multiple moving parts.

To begin, as stated during the April 12, 2022 pre-trial conference, the anticipated trial involves the limited issues of whether Defendants intentionally deployed pepper spray down Plaintiff's pants and on his groin, and if so, whether such conduct was in retaliation for Plaintiff taking photos.  All evidence must relate to – and not exceed the scope of – these claims and the defenses thereto.  Plaintiff's belief that drugs were planted on him after-the-fact do not inform these issues; it is accordingly irrelevant under FRE 401 and inadmissible under FRE 402.  Given this, despite Plaintiff's concerns, it would appear that Defendants do not intend to introduce Plaintiff's conviction at trial anyway.

That said, criminal convictions *are* relevant toward "attacking a witness's character for truthfulness."  Fed. R. Evid. 609(a) (party may impeach witness with prior conviction if conviction was punishable by death or imprisonment for more than one year or is crime of dishonesty).  Indeed, FRE 609 states that evidence of felony convictions "must be admitted, subject to [FRE] 403" in civil cases.  *Id*. at 609(a)(1)(A).  That such evidence remains subject to FRE 403's balancing test does not undercut its relevance in the first place.  *Id*.  In any event, Defendants do not intend to impeach the Plaintiff, if he testifies, with *this* felony drug conviction.[13]  Instead, they might impeach him with a prior felony conviction.

Further, as a practical matter, a wholesale exclusion of Plaintiff's criminal history is impossible given its context for the events alleged in Plaintiff's Complaint.  In this sense, it could also confuse the jury.  For example, Plaintiff's criminal history explains why, on October 4, 2017, three state troopers arrived at the East Boise POE in response to a call involving Plaintiff.

---

[13]  At the same time, should Plaintiff choose to testify about alleged planting of drugs, inquiry into his guilty plea may become appropriate.

**MEMORANDUM DECISION AND ORDER - 21**

It also helps explain why Defendants detained Plaintiff and initiated a mental hold (e.g., Defendants learned that Plaintiff was on parole and was schizophrenic). These are important frames of reference for the jury; they set the scene leading up to the confrontation between Plaintiff and Defendants. Still, Plaintiff's *complete* criminal history, like his drug conviction standing alone, is of minimal relevance here and similarly risks unfairly prejudicing Plaintiff under FRE 403.[14]

To proactively address this situation, and consistent with the Court's consideration of the Plaintiff's mental health issues elsewhere in this Memorandum Decision and Order, Defendants themselves may testify to the circumstances of their presence at the East Boise POE and actions taken that day. This naturally may include aspects of Plaintiff's criminal history. An unredacted audio regurgitation of Plaintiff's criminal history, however, will not be permitted.

In this respect, Plaintiff's Second Motion in Limine (Dkt. 141) is granted, in part, and denied, in part.

    3.    <u>Plaintiff's Video Deposition</u>

Plaintiff was incarcerated when he was deposed. During his videotaped deposition, he wore prison clothing while sitting behind a window in what best can be described as an interrogation room. Plaintiff argues that the probative value of presenting the video deposition to the jury under these circumstances would be substantially outweighed by its prejudicial effect under FRE 403. Pl.'s Second MIL at 4 (Dkt. 141). The Court agrees.

The probative value of Plaintiff's deposition testimony – which most assuredly will be to prove up any statements that he makes during trial that are inconsistent with his deposition

---

[14]  A preview of this issue took place at the April 12, 2022 pre-trial conference when Defendants' counsel indicated that Plaintiff's criminal history is already in the record by way of the audio/visual recordings taken in relation to Plaintiff's arrest – namely, the real-time communications from police dispatch and Plaintiff's parole officer.

testimony – is satisfied by the existence of a deposition transcript.  Showing Plaintiff in jail

clothing while clearly in custody – when the deposition transcript is available – is unnecessary

and would be unfairly prejudicial.  Plaintiff's videotaped deposition will not be permitted at trial.

Plaintiff's Second Motion in Limine (Dkt. 141) is granted in this respect.

### D.      Defendants' Motion in Limine (Reports/Declarations) (Dkt. 139)

Defendants move to prohibit Plaintiff's experts' reports and declarations from being

admitted into evidence and provided to the jury.  Defs.' MIL (Rpts./Decls.) (Dkt. 139).

Specifically, Defendants argue that such reports and declarations are "out-of-court statements

offered for their truth and so fall within the definition of hearsay" under FRE 801.  Mem. ISO

MIL (Rpts./Decls.) at 3 (Dkt. 139-1).  The Court agrees.

Expert reports, like declarations themselves, are hearsay because they amount to out-of-

court statements offered for their truth.  Fed. R. Evid. 801(c) (defining hearsay); Fed. R. Evid.

802 (excluding hearsay).  Neither falls within a hearsay exception under FRE 803.  Plaintiff's

experts' reports and declarations (as well as those from Defendants' expert) are therefore

inadmissible.  *See, e.g.*, *Alexie v. United States*, 2009 WL 160354 (D. Alaska 2009) (excluding

the experts' written reports, but "not foreclosing use of tables, graphs, or the like which may be

contained in such reports, either as demonstrative exhibits or as exhibits admitted by

stipulation.") (citing FRE 1006 ("Summaries to Prove Content")).

Defendants' Motion in Limine (Reports/Declarations) (Dkt. 139) is granted.

### E.      Defendants' Motion in Limine (New York Times Article) (Dkt. 140)

Plaintiff's Exhibit List references a "[c]opy of a New York Times article about the

prejudice people with mental illness suffer in the community."  Pl.'s Ex. List at 2 (Dkt. 132); *see

also* Ex. HH to Olsen Decl. ISO MIL and Spoliation J.I. (Dkt. 125-4) ("Attached as Exhibit HH

is a true and correct copy of a New York Times article about the prejudice people with mental

**MEMORANDUM DECISION AND ORDER - 23**

illness suffer in the community.").  Defendants move to prohibit this article from being admitted

into evidence and provided to the jury.  Defs.' MIL (NYT Article) (Dkt. 140).  Specifically,

Defendants argue that "the article is inadmissible due to hearsay issues."  Defs.' MIL (NYT

Article) at 2 (Dkt. 140-1).  The Court agrees.

This article contains only the subjective impressions of its author, Karen Brown, based on

her own experiences and observations.  Ms. Brown is not a witness in this case.  Similarly, the

individuals quoted in the article are not witnesses in this case.  The article itself is thus an out-of-

court statement offered for the truth of the matter asserted.  Fed. R. Evid. 801(c); Fed. R. Evid.

802.  Because no exception exists, the listed article is inadmissible.  *Larez v. City of Los Angeles*,

946 F.2d 630, 642 (9th Cir. 1991) ("[N]ewspaper articles have been held inadmissible hearsay as

to their content.").

Defendants' Motion in Limine (New York Times Article) (Dkt. 140) is granted.

## CONCLUSION

This Order is intended to assist the parties in their preparation for trial by, to the extent

possible, giving the parties guidance in structuring their presentation of evidence.  The parties

must abide by the Court's rulings, in the first instance during opening statements, but may ask

for reconsideration as trial progresses.  The final ruling on the admissibility of any particular

testimony or piece of evidence will be made at trial. *See United States v. Bensimon*, 172 F.3d

1121, 1127 (9th Cir. 1999) ("The district court may change its ruling at trial because testimony

may bring facts to the district court's attention that it did not anticipate at the time of its initial

ruling.").  During the trial, the parties are directed to advise the Court in advance of evidentiary

issues they anticipate arising so that the Court can address the same outside the presence of the

jury, if necessary.  The parties shall do so by notifying the law clerk regarding such issues well in

advance of the evidence being offered.

**MEMORANDUM DECISION AND ORDER - 24**

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED** as follows:

1.      Plaintiff's Motion to Exclude or Alternatively Limit the Testimony of Defendants' Expert John Kapeles (Dkt. 119) is GRANTED, in part, and DENIED, in part.

2.      Plaintiff's Motion in Limine, Sanctions for Spoliation of Evidence, and Proposed Jury Instructions (Dkt. 125) is GRANTED, in part, and DENIED, in part.

3.      Plaintiff's Second Motion in Limine (Dkt. 141) is GRANTED, in part, and DENIED, in part.

4.      Defendants' Motion in Limine (Reports/Declarations) (Dkt. 139) is GRANTED.

5.      Defendants' Motion in Limine (New York Times Article) (Dkt. 140) is GRANTED.


DATED:  April 15, 2022

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge