# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| CLINTON B. RUSH, | Case No.: 1:18-cv-00073-REP |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S REVISED MOTION FOR A NEW TRIAL AND FOR SANCTIONS** |
| vs. | |
| ANDREW D. WEINSTEIN; DONALD HEIDA; and JANET MURAKAMI, | **(Dkt. 191)** |
| Defendants. | |

Pending before the Court is Plaintiff's Revised Motion for a New Trial and for Sanctions (Dkt. 191). The facts and legal arguments are adequately presented in the parties' briefing and the record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motion is decided based on the record. For the reasons that follow, there is no basis either to order a new trial or to sanction Defendants' counsel. The Motion is therefore denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On February 14, 2018, Plaintiff Clinton Rush filed a lawsuit against Defendants Andrew Weinstein, Donald Heida, and Janet Murakami (three Idaho State Police Officers). Mr. Rush claimed that, as part of an October 4, 2017 encounter at the East Boise Port of Entry, at least one Defendant purposely pepper-sprayed him down his pants and toward his genitals in the moments leading up to his eventual arrest. In turn, Mr. Rush brought an excessive force/bodily integrity

---

[1] The factual background of the case is stated with brevity, as it is already well-known to the parties and the Court. For the sake of completeness, a more thorough discussion of the factual background can be found within the Court's September 20, 2021 Memorandum Decision and Order (Dkt. 110).

**MEMORANDUM DECISION AND ORDER - 1**

claim under 42 U.S.C. § 1983 against Defendants, alleging that each of them, acting under color of state law, deprived him of his rights under the Fourth Amendment.

A five-day jury trial was held in this matter and, after deliberation, the jury returned a verdict in Defendants' favor on May 6, 2022.  Special Verdict Form (Dkt. 179).  The Court entered judgment three days later.  Jgmt. (Dkt. 180).

On May 11, 2022, Mr. Rush filed a Motion for New Trial and for Sanctions (Dkt. 181).  That motion, however, did not contain citations to the official trial transcript.  At the Court's direction, Mr. Rush filed the at-issue Revised Motion for New Trial and For Sanctions (Dkt. 191) on June 23, 2022, upon the official trial transcript's filing.[2]  Therein, Mr. Rush argues that a new trial should be granted because (i) he was prejudiced by the clear appearance that he was incarcerated throughout the trial, (ii) Defendants' counsel violated several limiting orders from the Court, and (iii) Defendants' counsel committed numerous acts of misconduct that prevented a fair trial, resulted in manifest injustice, and violated the dignity of the courtroom.  *See generally* Mem. ISO Revised Mtn. for New Trial (Dkt. 191).  Mr. Rush additionally submits that certain of Defendants' counsel's misconduct amounted to bad faith that now warrants sanctions in the amount of his costs and attorney's fees at trial.  *Id*.  Defendants oppose the Motion in all respects.  Opp. to Revised Mtn. for New Trial (Dkt. 192).

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 59(a)(1)(A) permits courts to order a new trial on all or some of the issues to any party after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on

---

[2]  Mr. Rush's original Motion for New Trial and for Sanctions (Dkt. 181) is therefore denied as moot.

the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  In ruling

on a motion for new trial, courts have the right and the duty to "weigh the evidence and assess

the credibility of witnesses, and need not view the evidence from the perspective most favorable

to the prevailing party." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 190 (9th Cir.

1989) (citations and quotation marks omitted); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th

Cir. 2007).  However, a court may not upset the verdict "merely because it might have come to a

different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174,

1176 (9th Cir. 1990) (citation and quotation marks omitted).

"Rule 59 does not specify the grounds on which a motion for new trial may be granted."

*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  Rather, district courts

are "bound by those grounds that have been historically recognized." *Id.*  In the Ninth Circuit,

"[h]istorically recognized grounds include, but are not limited to, claims 'that the verdict is

against the weight of the evidence, that the damages are excessive, or that, for other reasons, the

trial was not fair to the moving party.'" *Molski*, 481 F.3d at 729 (quoting *Montgomery Ward &

Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  Stated differently, "[t]he trial court may grant a new

trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or

perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson

Consumer Prods.*, 212 F.3d 493, 510, n.15 (9th Cir. 2000).

### III.  DISCUSSION

Mr. Rush believes that he did not receive a fair trial for several reasons.  First, he claims

that he was unfairly depicted as dangerous, owing to the presence of armed security officers

during trial, having to testify in leg restraints not visible to the jury, and being seen by two jurors

exiting the jail transport vehicle while in hand and leg restraints and wearing a prison jumpsuit.

Second, he claims that Defendants' counsel disregarded Court orders limiting the evidence and

scope of examinations at trial.  Third, he claims that Defendants' counsel engaged in actionable misconduct by presenting irrelevant and overly prejudicial evidence, purposely misrepresenting facts and testimony, and making inflammatory and vulgar statements throughout trial.  Mem. ISO Revised Mtn. for New Trial at 2-26 (Dkt. 191-1).  According to Mr. Rush, these reasons justify a new trial pursuant to Rule 59(a)(1)(A) and also support monetary sanctions against Defendants' counsel under the Court's inherent powers and 28 U.S.C. § 1927.  *Id.*[3]

Defendants preliminarily maintain that Mr. Rush forfeited his right to complain about nearly all of these issues because of his counsel's failure to object at trial.  Opp. to Revised Mtn. for New Trial at 2-3 (Dkt. 192).  Regardless, they argue that there was no error at trial and, even if there was error, it did not affect Mr. Rush's substantial rights or the fairness of the proceedings.  *Id*. at 3-21.  To the contrary, Defendants insist that the overwhelming evidence at trial was that Defendants never pepper-sprayed Mr. Rush down his pants.  *Id*.

The parties' arguments are considered below.

## A.  The Court's Security Measures Did Not Inherently Prejudice Mr. Rush at Trial

At the end of the April 12, 2022 pre-trial conference, Defendants' counsel asked "for some kind of restraints" on Mr. Rush during trial because counsel "fear[ed] for the safety of everyone in the courtroom."[4]  He supported this position by noting Mr. Rush's two prison terms for battery on a police officer (including one stemming from the October 4, 2017 incident giving rise to this action), his verbal combativeness while being deposed, and his mental illness.  The

---

[3]  Mr. Rush generally organizes the arguments relating to the alleged violations of Court orders and attorney misconduct by the different trial stages – specifically, Defendants' opening statement, Defendants' cross-examination and direct-examination, and Defendants' closing argument.  Mem. ISO Revised Mtn. for New Trial at 10-22 (Dkt. 191-1).  This Memorandum Decision and Order attempts to track this same outline for consistency's sake.

[4]  The Court has listened to the audio recording of the April 12, 2022 pre-trial conference and incorporates here the exact words used by Defendants' counsel.

**MEMORANDUM DECISION AND ORDER - 4**

Court rejected Defendants' request and indicated that an unobtrusive United States Marshals Service ("USMS") presence would ensure courtroom safety instead.

Ultimately, as a state prisoner pursuing a Section 1983 action in federal court, the Court ordered the Idaho Department of Corrections ("IDOC") to coordinate Mr. Rush's transport for the purposes of his attendance and testimony at trial. Order Re: Pet. for Writ of Habeas Corpus Ad Testificandum (Dkt. 159). And, because Mr. Rush remained in IDOC custody throughout trial, two IDOC officers were likewise required to be present – each seated behind and off to the side of Mr. Rush. A single USMS deputy was also positioned in the front corner of the courtroom – closer to courtroom personnel – for the duration of the trial.[5] Consistent with this security arrangement, the IDOC officers were responsible for Mr. Rush while the USMS deputy was responsible for the courtroom and its attendees.

Mr. Rush wore a suit and tie during trial and was never in any restraints while seated next to his counsel. Before and after Mr. Rush testified, the Court took a break and dismissed the jury so that he could be ushered to and from the witness stand (while in leg restraints). Mr. Rush testified in leg restraints that were not visible to the jury.

At no time during trial did Mr. Rush's counsel object to these security measures. Still, Mr. Rush now argues that each of them – in addition to an incident on the final day of trial where Mr. Rush believes that two jurors saw him in a prison jumpsuit while they were behind the IDOC transport vehicle on its way to the courthouse – violated his right to a fair trial. Mr. Rush contends that these instances improperly suggested that he is a dangerous criminal, were "inherently prejudicial," and justify a new trial under *Claiborne v. Blauser*, 934 F.3d 885 (9th

---

[5] As with every court proceeding, a Court Security Officer ("CSO") was also stationed in the gallery near the entrance to the courtroom.

**MEMORANDUM DECISION AND ORDER - 5**

Cir. 2019).  Mem. ISO Revised Mtn. for New Trial at 3-5, 22-24 (Dkt. 191-1).  The Court disagrees.

In *Claiborne*, the Ninth Circuit considered whether the visible shackling of a pro se plaintiff – a state inmate – during a three-day trial on his Section 1983 claims for excessive force and deliberate indifference by defendant prison guards deprived him of a fair trial in violation of the United States Constitution.  *Claiborne*, 934 F.3d at 889-92.  Critically, the case turned on whether the defendants' use of force against the plaintiff while escorting him within the prison was excessive, or instead was justified by the plaintiff's aggressive behavior.  *Id.* at 899.  The plaintiff's criminal record consisted of nonviolent property and drug offenses, he was not considered violent or confrontational in jail, and he did not disrupt trial, act disrespectfully, or attempt to escape.  *Id*. at 898.  Notwithstanding, the district court ordered him visibly shackled during trial without any prior discussion of the need or reasons therefor.  *Id*. at 892, 897-98.  Although the plaintiff did not object to the shackling during trial, he raised the issue in support of his motion for a new trial.  *Id.*  The district court denied the motion, holding that it would have imposed shackling over any objection at trial solely because of the plaintiff's status as a convicted felon who was serving a lengthy jail sentence.  *Id.* at 893.

On appeal, the Ninth Circuit confirmed that errors not objected to at trial are generally subject to waiver or forfeiture, stating: "'Forfeiture is the failure to make a timely assertion of a right, whereas waiver is the intentional relinquishment or abandonment of a known right.  Forfeited rights are reviewable for plain error, while waived rights are not.'"  *Id*. at 893 (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)).

The Ninth Circuit undertook plain error review.  *Id.* at 893-94.  Under plain error review, courts consider whether (i) there was error; (ii) the error was obvious; (iii) the error affected

**MEMORANDUM DECISION AND ORDER - 6**

substantial rights; and (iv) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*. at 893, 897.

Against this standard, the court held that the district court plainly erred in allowing the plaintiff to be visibly shackled throughout trial without any showing of a sufficient need for such restraints. *Id*. at 898-99. Further, the court held that the plain error affected the plaintiff's substantial rights because his dangerousness was the "key issue" at trial. *Id.* at 899-900 ("In short, if the jury believed that Claiborne posed a threat to the officers, then defendants prevailed because their use of force was justified."). Finally, the court found that the error seriously affected the dignity of the court proceedings because shacking presents a unique affront. *Id.* at 900-01. Thus, the court reversed the district court's denial of the plaintiff's motion for a new trial and remanded. *Id.* at 901.

Here, as a threshold matter, Mr. Rush – unlike the plaintiff in *Claiborne* – was represented by counsel at trial. Mr. Rush's counsel never objected to the security measures imposed by the Court during the trial. He posits no reason why he could not have. Accordingly, Mr. Rush forfeited his objection to the security measures. *Id*. at 893. Review of the measures, then, is conducted for plain error. *Id*. at 893, 897.

Unlike *Claiborne,* where the court found plain error from the visible shackling of the plaintiff, without a prior determination that shackling was necessary, there was no such plain error here because Mr. Rush was not visibly shackled. Instead, at the April 12, 2022 pre-trial conference, the Court considered Defendants' counsel's request for shackling Mr. Rush and denied it. On this most crucial fact, *Claiborne* is distinguished.

The Court did, however, consider Defendants' claims at the pretrial conference regarding Mr. Rush's dangerousness: namely, that Mr. Rush (i) had twice committed and been convicted of battery on a police officer, (ii) was agitated and verbally combative during his deposition, and

**MEMORANDUM DECISION AND ORDER - 7**

(iii) suffers from mental illness that causes delusions.  Further, the Court had before it other record evidence of Mr. Rush's dangerousness.[6]  As a result, the Court determined that Mr. Rush *did* pose a security risk at trial.  So, the Court imposed the less restrictive alternatives to visible shackling: (i) having two IDOC officers and one USMS deputy present in the courtroom; and (ii) having Mr. Rush wear leg restraints, that were not visible to the jury, only while testifying.[7]  Accordingly, the Court satisfied *Claiborne's* requirement that it make an individualized security determination and properly exercised its discretion to balance Mr. Rush's right to a fair trial with maintaining courtroom security.  *See Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir. 1994) ("The judge has wide discretion to decide whether a defendant who has a propensity for violence poses a security risk and warrants increased security measures."); *see also* Tr. at 1051:8-12 (Dkt. 190) (Court stating: "So we've done our – the best we can possibly do to try to insulate Mr. Rush from any prejudice from this, while maintaining the security of the courtroom for someone who is in custody.").  Thus, there was no plain error here.

---

[6]  Mr. Rush's own parole officer – speaking to Defendant Murakami while she and Defendant Weinstein contemporaneously assessed Mr. Rush's mental health status during their interaction with him on October 4, 2017 – noted Mr. Rush's generally-aggressive and violent temperament, while relatedly commenting how Mr. Rush would "probably" have guns and drugs in his vehicle.  *See* Defs.' Tr. Ex. 505 at 3:42:50-3:44:46 (Defendant Murakami's "dash-cam" video and recording).  The Court previously considered this dash-cam video and recording when it addressed Defendants' Renewed Motion for Summary Judgment.

[7]  Mr. Rush argues that, even though the leg restraints were not visible to the jury during his testimony, they could easily ascertain as much "given that the jury took a break every time that [he] testified."  Mem. ISO Revised Mtn. for New Trial at 22 (Dkt. 191-1).  This argument assumes too much.  There is no evidence that the jury associated any of its multiple breaks with any of the Court's security protocols.  This argument also ignores how other courts attempt to satisfy *Claiborne* by this exact, less restrictive alternative to visible restraints.  *See, e.g.*, *Jones v. Wood*, 2022 WL 797891, at *2 (D. Ariz. 2022) ("[T]he Court will apply a table skirt to Plaintiff's table, concealing his restraints from the jury, and will ensure that Plaintiff approaches and departs the witness stand outside the jury's presence."); *Crago v. Pitz*, 2022 WL 4094150, at *2 (D. Ariz. 2022) (same).

**MEMORANDUM DECISION AND ORDER - 8**

But even if there was, that error did not affect Mr. Rush's substantial rights. *Claiborne,*

934 F.3d at 893.  Here, in stark contrast to the "key issue" in *Claiborne,* whether the Defendants'

force was excessive, or instead justified by Mr. Rush's dangerousness, was not an issue the jury

was asked to resolve.  Indeed, the issue was effectively taken off the table by stipulation of the

parties and the Court's jury instructions.  The Court instructed the jury:

> *The parties have stipulated that intentionally pepper-spraying a person down his pants and toward his genitals amounts to an unreasonable seizure and excessive force that causes injury, in violation of the Fourth Amendment.*
>
> Therefore, to establish an unreasonable seizure and excessive force in violation of the Fourth Amendment in this case, Plaintiff must prove by a preponderance of the evidence that Defendants Weinstein, Murakami, and/or Heida intentionally pepper-sprayed him down his pants and toward his genitals.
>
> *Conduct unrelated to Plaintiff's specific allegation that Defendants Weinstein, Murakami, and/or Heida intentionally pepper-sprayed him down his pants and toward his genitals is not at issue in this case.*  In other words, any allegation by Plaintiff as to any form of battery or unlawful touching by any Defendant (other than the allegation of being pepper-sprayed down his pants and toward his genitals) should not be considered by you.
>
> *Thus, if you find that Plaintiff has proven that one or more of the Defendants intentionally pepper-sprayed him down his pants and toward his genitals, you may find that Plaintiff has proven Element 2 of his Fourth Amendment Section 1983 claim by a preponderance of the evidence.*

Jury Inst. No. 28 (Dkt. 183) (emphasis added).[8]  Thus, the jury was instructed to resolve one

question to decide the sole contested element: Did Defendants purposely pepper-spray Mr. Rush

down the front of his pants?  If so, the jury was instructed that it amounted to excessive force,

regardless of Mr. Rush's conduct.  The jury is presumed to have followed the instruction.

*Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1023 (9th Cir. 2000).  As such, whether Mr.

---

[8]  This instruction speaks to the second of two elements of Mr. Rush's Section 1983 claim against Defendants.  The parties also stipulated that the first element of Mr. Rush's claim was established.  Jury Inst. No. 27 (Dkt. 183) ("The parties have stipulated that each Defendant acted under color of state law.  So you may accept Element 1 as proven by a preponderance of the evidence.").  No party objected to the jury instructions.  Tr. at 741:12-25 (Dkt. 189).

**MEMORANDUM DECISION AND ORDER - 9**

Rush posed a danger to Defendants, or was the aggressor, simply was not relevant in the way it was in *Claiborne.*  Hence, even if the jurors concluded from the presence of the IDOC officers and USMS deputy that Mr. Rush was serving a jail sentence and was dangerous, it should not have affected their verdict in the least.  Unlike *Claiborne,* then, Mr. Rush's substantial rights were not affected by any purported error.

Finally, any purported error from the security measures did not affect the fairness, integrity, or public reputation of the trial.  *Claiborne,* 934 F.3d at 893.  Again, visible shackling presents a unique threat to these pillars.  *Id.* at 895 (visible shackling can (i) undermine presumption of innocence, and the fairness of factfinding, in a criminal trial; (ii) physically impair attorney-client communication; and (iii) pose an affront to the dignity and decorum of the proceedings).  But visible shackling did not happen here.  Instead, three officers guarded the courtroom.  Even if two officers had "IDOC" emblazoned across their chests, it is difficult to see how this affected the fairness, integrity, or reputation of the trial in the same way that the vision of Mr. Rush's hands and feet restrained by cuffs and chains, and the sounds of those chains clanging as he moved, would have.  In sum, Mr. Rush's *Claiborne* challenge to the security measures fails.

For different reasons, Mr. Rush's *Claiborne* challenge based on the transport incident also fails.  On the last day of trial, just *after* closing arguments and the Court excusing the jury for deliberations, Mr. Rush's counsel first brought to the attention of the Court his client's allegation that two jurors saw Mr. Rush dressed in a prison jumpsuit while in a transport vehicle *early that morning.*  Tr. at 1049:18-1050:20 (Dkt. 190).  At that time, the Court observed that polling jurors about the incident immediately before they began deliberations might draw undue attention to it.  *Id.* at 1051:22-25.  Nonetheless, the Court directly asked Mr. Rush's counsel "what [he] would like the Court to do."  *Id.* at 1052:6-9.  Mr. Rush's counsel indicated that he

just wanted to make a record and he did not want the Court to take any action.  *Id.* at 1052:10-21
(Mr. Olsen: "You know, all I want to do at this point is to make a record."  Court: "All right. So
you're not asking the Court –"  Mr. Olsen: "No. No.  I agree with you.  I think, at this point,
drawing any attention to it probably makes it worse.  I just will make a record, just in case
something comes out during the deliberations and information that this has become an issue.
Then that's probably when we'll need to address it.  Hopefully, that won't happen, but at least we
have a record now.").

　　　　Having waited a full trial day, and after the jury retired to deliberate, to inform the Court
of the incident, and having not sought contemporaneous remedial measures when directly asked
by the Court, Mr. Rush has *waived* any claim for a new trial related to the alleged transport
incident.  *Claiborne,* 934 F.3d at 893 (waiver is the "intentional relinquishment or abandonment
of a known right") (quoting *Perez*, 116 F.3d at 845).  Mr. Rush's counsel proposed "pull[ing the
two jurors] aside" and having the Court inquire of them.  Tr. at 1050:15-16 (Dkt. 190).  So, it is
clear he understood he had the right to seek remedial measures to address any potential
prejudice.  Yet, when asked directly what he wanted the Court to do, Mr. Rush's counsel
declined any action by the Court.  *Supra*.  As such, Mr. Rush intentionally relinquished or
abandoned his right to seek remedial measures, and cannot now be heard to complain about any
purported prejudice.  No plain error review, thus, is warranted.  *Claiborne,* 934 F.3d at 893
("Forfeited rights are reviewable for plain error, while waived rights are not.") (quoting *Perez*,
116 F.3d at 845).

　　　　Even if plain error review was required, there was no plain error here.  Mr. Rush was the
source of the allegation that two jurors – from a vantage point behind the transport van in which
he was riding – saw him and noticed his prison garb.  To be sure, it is not clear if the two jurors
did, or even could have.  Indeed, neither of them informed the Court that they had, or that they

**MEMORANDUM DECISION AND ORDER - 11**

were aware anyone else had.  If they had seen Mr. Rush wearing a prison jumpsuit while inside the transport vehicle, the Court would have expected them to do so based on its instructions.  *See* Jury Inst. No. 11 (Dkt. 182) ("If any juror is exposed to any outside information, please notify the court immediately.").

Even if the two jurors did see Mr. Rush, but did not volunteer this information, this error did not affect Mr. Rush's substantial rights.  As set forth above, this case did not turn on whether Mr. Rush was dangerous or provoked the pepper-spraying; the jury was compelled to find excessive force if they found Defendants intentionally sprayed pepper spray down Mr. Rush's pants.  *Supra*.  That the jury may have concluded that Mr. Rush may be in prison for assaulting the Defendant officers, or for some other reason, would not have affected this finding, or its verdict.

Further, Mr. Rush voluntarily chose to testify, and thereby exposed himself to impeachment with his prior felony conviction.  *Infra* (citing Tr. at 215:7-9 (Dkt. 187)).  Once he willingly put his felony conviction before the jury, the fact that he was also incarcerated at the time of trial resulted in marginal (if any) additional prejudice.  Finally, the Court repeatedly instructed the jurors not to consider matters outside of court.  Tr. at 1045:4-1048:5, 1050:21-25 (Dkt. 190); *see also* Jury Inst. Nos. 1, 6, 17 (Dkts. 182 & 183) ("You must decide the case solely on the evidence before you. . . .  In reaching your verdict, you may consider only the testimony and exhibits received into evidence. . . .  Anything you may see or hear when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.").  Again, jurors are presumed to follow jury instructions.  *Caudle*, 224 F.3d at 1023.  So, the fact that Mr. Rush was imprisoned should not have been considered.

Under these circumstances, a new trial is not warranted.

**B.**   **Defendants' Counsel's Conduct at Trial Does Not Now Warrant a New Trial**

**MEMORANDUM DECISION AND ORDER - 12**

As a separate basis for a new trial, Mr. Rush focuses upon Defendants' counsel's alleged misconduct throughout the course of trial.  Generally, misconduct by trial counsel results in a new trial if "counsel's actions were intentionally improper and the 'flavor of misconduct sufficiently permeate[d] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'"  *Langley v. Colegio*, 854 Fed. Appx. 149, 152 (9th Cir. 2021) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002)).  In evaluating the likelihood of prejudice from attorney misconduct, courts consider "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and verdict itself."  *Hemmings*, 285 F.3d at 1193.

Mr. Rush's argument primarily relies on two points: (i) Defendants' counsel purposely violated pre-trial orders and Court admonitions during trial, and (ii) Defendants' counsel generally abused the judicial process by improperly attacking his character at trial through the repeated use of inflammatory and vulgar language.  Mem. ISO Revised Mtn. for New Trial at 2, 10-11, 24-26 (Dkt. 191-1).  His brief then segues into a montage of trial highlights – during opening statement, cross-examination, direct-examination, and closing argument – where Defendants' counsel allegedly engaged in conduct that justifies a new trial.  *Id*. at 11-22.  The Court addresses each argument in turn.

1.    Opening Statement

Mr. Rush argues that he was unfairly prejudiced at trial when, during Defendants' opening statement, counsel (i) spent more than half of his time discussing events leading up to Mr. Rush's arrest, (ii) told the jury that Mr. Rush committed a felony, (iii) emphasized that Mr. Rush was on parole, (iv) made numerous statements pertaining to Mr. Rush's mental illness, and (v) repeated vulgar statements made by Mr. Rush.  Mem. ISO Revised Mtn. for New Trial at 11

**MEMORANDUM DECISION AND ORDER - 13**

(Dkt. 191-1).  Mr. Rush's counsel did not object to any of these instances until moving for a new trial, so plain error review applies (unless there was waiver).  These arguments are without merit.

The Ninth Circuit has held that "where offending remarks occurred principally during opening statement . . ., rather than throughout the course of the trial, [courts] are less inclined to find the statements pervaded the trial and thus prejudiced the jury."  *Settlegoode v. Portland Public Schs.*, 371 F.3d 503, 518 (9th Cir. 2004).  "[T]he trial court is in a superior position to gauge the prejudicial impact of counsel's conduct during the trial."  *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 346 (9th Cir. 1995); *see also McIntosh v. Northern Cal. Universal Enters., Inc.*, 2010 WL 2698747, at *12 (E.D. Cal. 2010) ("Great deference is given to the trial judge to gauge prejudicial effect of attorney misconduct.").  Defendants' counsel's above-referenced conduct does not meet this standard.

### a.    Events Leading Up to Mr. Rush's Arrest

The events leading up to Mr. Rush's arrest explained to the jury why law enforcement was called to the scene, why Defendants initially detained Mr. Rush, and why Defendants considered initiating a mental hold.  4/15/22 MDO at 10, 21-22 (Dkt. 156).  This context helped set the scene for the jury so that they were able to fully understand what was taking place in the moments leading up to Mr. Rush's altercation with Defendants.  *Id*.  Consequently, this allowed the jury to properly assess the parties' positions pertaining to Mr. Rush's allegation that he was purposely pepper-sprayed down his pants.  That Defendants' counsel may have spent more than half of his opening statement supplying this background information was not improper.

### b.    Statements About Mr. Rush Committing a Felony

As a result of Mr. Rush's conduct on October 4, 2017, he was arrested and charged with four criminal counts, including battery on a police officer.  Yee-Wallace Decl. at ¶ 3(a) (Dkt. 33).  Mr. Rush claims that Defendants' counsel's three references in opening statement to Mr.

**MEMORANDUM DECISION AND ORDER - 14**

Rush having "committed a felony" that day were inflammatory and irrelevant, offered for the improper purpose of attacking his character, and violated a Court order. *See* Mem. ISO Revised. Mot. for New Trial at 11 (Dkt. 191-1). Defendants counter that the references were proper to provide context for their reaction to the felonious battery, and regardless, no prejudice ensued because the jury saw and heard evidence of Mr. Rush's arrest. Opp. to Revised Mtn. for New Trial at 6 (Dkt. 192).

The Court agrees with Defendants. Regardless of the purpose for which Defendants' counsel made the references in opening statement, it was inevitable that the jury would (and did) become aware that Mr. Rush committed a felony during trial. This was plain to the jury from the moment they viewed the video of Mr. Rush punching Defendant Weinstein in the face without provocation. It was reinforced by Mr. Rush's subsequent arrest, also viewed by the jury on video. Likely, most jurors are aware that arrests occur only for felony offenses, but typically not misdemeanor offenses. As such, it is difficult to glean any prejudice to Mr. Rush from Defendants' counsel stating in opening that he committed a felony on October 4, 2017.

Moreover, referencing that Mr. Rush committed a felony was indeed relevant; it was part of the story of the case on trial. When a felony is committed in a police officer's presence, the officer may conduct an arrest. When the felony is a violent felony (especially one directed at the officer), the officer may use appropriate force to conduct the arrest. While the parties and the Court narrowed the excessive force element the jury was to resolve (whether Defendants purposely pepper-sprayed Mr. Rush down his pants), the fact that Mr. Rush beforehand committed a violent felony battery against Defendant Weinstein provided context and justification for the Defendants' deployment of pepper-spray in the first instance. *See* Jury Inst. No. 2 (Dkt. 182). As such, Defendants' counsel had a good-faith basis to forecast this relevant evidence in his opening statement.

**MEMORANDUM DECISION AND ORDER - 15**

Nor did these references violate the Court's April 15, 2022 Memorandum Decision and Order.  There, the Court considered Mr. Rush's argument that his "past criminal history" should be excluded from trial.  Pl.'s Second MIL at 3 (Dkt. 141).  The Court agreed, but only to a point – namely, that a gratuitous recounting of Mr. Rush's entire, unrelated, past criminal history, including felony drug conviction resulting from the October 4, 2017 incident, were generally inadmissible.  4/15/22 MDO at 21-22 (Dkt. 156) ("Plaintiff's *complete* criminal history, like his drug conviction standing alone, is of minimal relevance here and similarly risks unfairly prejudicing Plaintiff under FRE 403.") (emphasis in original).  Importantly, however, the Court discussed the admissibility of criminal convictions under FRE 609 and how certain "aspects of Mr. Rush criminal history" remained important "frames of reference" for the jury.  *Id*. ("[A]s a practical matter, a wholesale exclusion of Plaintiff's criminal history is impossible given its context for the events alleged in Plaintiff's Complaint.").  The commission of a felony mentioned in Defendants' opening statement were such appropriate contextual frames of reference that did not violate the Court's admonition against introducing Mr. Rush's complete, past criminal history into evidence.[9]

### c.  Statements About Mr. Rush Being On Parole

References to Mr. Rush's parole status are equally unavailing as plain errors.  Defendants' counsel's comments during opening statement about Mr. Rush's parole status on October 4, 2017, were not the first time the jury learned that Mr. Rush was on parole on that date.  Indeed, during his own opening statement, Mr. Rush's counsel made this fact known.  Tr.

---

[9]  At any rate, the jury soon learned via witness testimony that Mr. Rush had been arrested on October 4, 2017 and no doubt would have concluded it was because he committed a felony.  Mr. Rush's *first* witness after opening statements was Taylor Wasdahl.  Mr. Wasdahl was a Deputy Sheriff at the Ada County Jail on October 4, 2017.  Tr.53:7-54:7 (Dkt. 186).  He testified during direct examination about Mr. Rush's arrest and how Mr. Rush was housed at the jail.  *Id*. at 54:10-17, 60:9-61:9; *see also id.* at 65:8-66:3 (same during cross-examination).

**MEMORANDUM DECISION AND ORDER - 16**

at 15:7-10 (Dkt. 186) ("Anyway, at some point they learn that he – Mr. Rush was on parole.  So

at that point, they decided to try and call Mr. Rush's parole officer.").  Having already brought

up this fact, it was not improper for Defendants' counsel to do the same during his opening

statement.

d.     <em>Statements Concerning Mr. Rush's Mental Illness</em>

Likewise, Defendants' counsel only discussed Mr. Rush's mental illness *after* Mr. Rush's

counsel brought up the subject during his own opening statement.  For example, Mr. Rush's

counsel stated:

- "At the time, he was in a state of – as has already been noted, he does have some treatable mental illness.  He was in a state of delusional paranoia, but he was still coherent.  But he was clearly going through delusional thoughts and comments.  Okay?  *Id*. at 13:5-10.

- "[Defendant Murakami] realized at the outset that she was dealing with someone who was in a mental health crisis."  *Id*. at 13:16-18.

- "But Trooper Weinstein shows up on the scene and what he does most of the time is, basically, engage and talk with Mr. Rush and gets him to talk about his various conspiracy theories, basically kind of feeds on his delusions a bit."  *Id*. at 14:18-22.

- "Ms. Murakami did get ahold of various units within her department and got – and received an opinion that Mr. Rush was gravely disabled.  In other words, that he was a potential danger to himself and others.  In which case, you are brought to a mental hold."  *Id*. at 15:25-16:5.

- "Now, Mr. Rush, who is in a paranoid state – and part of it was that he – he was – if you're familiar with people that are – that go through this delusional-type paranoia, they start to think that everybody is against them.  They start to think that this is – you know, there are secret forces at work to destroy them, right?  Now, he's still coherent and he's engaging in conversation, but he's getting more agitated.  And then he hears that the third officer is on the way, and that raises his level of anxiety to the point where he steps out of his vehicle and begins to pace."  *Id*. at 17:3-15.

- "Mr. Rush lunges at Trooper Weinstein and punches him in the face.  Okay.  That is not an issue in this case.  That's an issue for a different matter in a different place.  You're not to hold it against him because

**MEMORANDUM DECISION AND ORDER - 17**

there are other ways of dealing with that.  Keep in mind, he is gravely disabled at the time." *Id.* at 18:5-13.

- "Now, they pull him up, take him to the patrol car, search him on the hood of the car, and that's where you start hearing some colorful metaphors coming from Mr. Rush.  So I want to warn you of that.  But keep in mind that he is in a delusional, paranoid state, but he is still aware of what has happened to him." *Id.* at 20:9-15.

- "Now, one of the things that Mr. Rush did, despite his mental illness, which is treatable – I think you're going to find that Clinton is an intelligent, articulate person.  He's not going to be the monster that the defendants are putting him out to be." *Id.* at 21:3-8.

In this setting, Defendants' counsel did not run afoul of this Court's order limiting the admission of Mr. Rush's mental illness.[10]  Because Mr. Rush's counsel fronted the issue during his opening statement, Defendants' counsel did not have to wait until he cross-examined Mr. Rush later at trial.  As with Mr. Rush's parole status, it was not improper for Defendants' counsel to refer to Mr. Rush's mental illness and delusions during opening statement.

>    e.    *Vulgar Comments Attributed to Mr. Rush*

Defendants' counsel's occasional, verbatim restatements of words used by Mr. Rush surrounding the October 4, 2017 incident are not overly concerning.  While unquestionably off-color and potentially problematic if needlessly repeated, these are Mr. Rush's own words after all, and contained within stipulated exhibits at trial.  But more to the point, these words supplied the jury with additional context as to Mr. Rush's behavior, the extent of his beliefs, and his

---

[10]  Within its April 15, 2022 Memorandum Decision and Order, the Court concluded that Mr. Rush's "mental illness is relevant for context and to his ability to perceive and recall the events giving rise to the instant dispute," subject to FRE 403's balancing considerations.  4/15/22 MDO at 11 (Dkt. 156).  Even so, the Court restricted Defendants from referencing Mr. Rush's mental illness unless and until he testified.  *Id.* ("Consistent with Rule 611(b), should Plaintiff testify, Defendants may inquire about Plaintiff's mental illness (and the delusional state it may have caused on the date of the events in question) to impeach Plaintiff on his ability to perceive and recall those events.").  However, Mr. Rush's counsel changed this dynamic by fronting the issue in his opening statement.

**MEMORANDUM DECISION AND ORDER - 18**

mental state during relevant timeframes (both when dealing with Defendants initially and later at the jail when describing being pepper-sprayed for the first time).

      2.    <u>Mr. Rush's Cross-Examination</u>

Mr. Rush argues that he was unfairly prejudiced at trial when, as part of Mr. Rush's cross-examination, Defendants' counsel (i) told Mr. Rush he was "heavily medicated" during trial; (ii) spent the first 40 minutes of Mr. Rush's cross-examination on the time leading up to his arrest; (iii) questioned Mr. Rush about his allegations concerning Defendants' other acts of violence that are not at issue in this case; (iv) asked Mr. Rush about being arrested for felonies and that his conduct amounted to a felony; (v) asked Mr. Rush about his conversations and communications with his lawyers; and (vi) asked Mr. Rush if he denied that he battered, obstructed, or resisted Defendants.  Mem. ISO Revised Mtn. for New Trial at 11-12 (Dkt. 191-1).  Mr. Rush's counsel did not object to nearly all of these instances (the possible exceptions are noted below) until moving for a new trial.  These arguments are without merit.

      *a.*    *Telling Mr. Rush That He Was Heavily Medicated During Trial*

Mr. Rush overstates his exchange with Defendants' counsel about whether he was heavily medicated during trial.  The back-and-forth actually revealed the following:

> Q:    Mr. Rush, you're not the same person in this courtroom that you were out on the field in that – on the day of your arrest.  You're a different person today, aren't you?
>
> A:    Yes.
>
> Q:    Well, for one thing, you're heavily medicated.  You were not on the day at the Port of Entry, right?
>
> A:    Actually, I'm on no meds right now.
>
> Q:    Okay.  But you've been medicated significantly since that time, haven't you?
>
> A:    Yes.

**MEMORANDUM DECISION AND ORDER - 19**

> Q:   And you were not on your meds when you were, in fact, out at the Port of Entry in October of 2017; isn't that correct?
>
> A:   Yeah, I was on my meds.
>
> Q:   Well, that's actually not true.  You had gone off of your meds.  Do you remember saying that earlier?
>
> A:   Well, I was off my meds, but – so I take a prescription.  Every day, you have to take meds.  But that prescription, it stays in your blood for a long time.  And to go off your meds with that prescription, you would have to go off your meds for like a good month.  And I was only off for maybe a few days.  It is still in my system at that time.

Tr. at 160-61 (Dkt. 187).  Defendants' counsel's examination on this point is properly understood as a legitimate effort simply to understand whether, in fact, Mr. Rush was medicated during trial.  This might explain for the jury the difference in his affect during the incident versus at trial.  But apparently, he was not medicated during trial.  *Id*. at 160.  Regardless, with the benefit of Mr. Rush's more complete explanation on the matter, there was no resulting prejudice.

> b.    *Events Leading Up to Mr. Rush's Arrest*

As stated above, the events leading up to Mr. Rush's arrest were relevant in this case. *Supra* ("This context helped set the scene for the jury so they were able to fully understand what was taking place in the moments leading up to Mr. Rush's altercation with Defendants.").  Further, the dash-cam videos that helped provide this vantage were *stipulated* exhibits.  Tr. 28:11-15 (Dkt. 186) (Mr. Olsen: "Well, I move to admit all of the videos."  Mr. Kane: "So stipulated."  The Court: "All right.  So both parties are agreeing then.").  Defendants' counsel did not improperly rely on these videos to help describe the events leading up to Mr. Rush's arrest. Nor was it improper, absent an objection, for Defendants' counsel to spend 40 minutes discussing these predicate events.

> c.    *Other Acts of Violence*

**MEMORANDUM DECISION AND ORDER - 20**

During direct examination, Mr. Rush narrated video clips of his altercation with

Defendants.  Mr. Rush variously commented how Defendants "were pushing on [his] neck," how

at least one Defendant "took [his] neck and . . . tried to . . . break it," how his neck and head were

"smashed in the ground," and how Defendant Weinstein "was the one that was smashing [his]

head into the ground."  *Id*. at 95:18-19, 96:18-20, 102:19-20, 106:24-107:3.  The Court allowed

Defendants' counsel to cross-examine Mr. Rush on these statements.  *Id*. at 138:9-11.

Defendants' counsel cross-examined Mr. Rush the next day as follows:

> Q:  Well, I don't want to get too deeply into this.  But, I mean, for example,
> do you realize you started telling this jury yesterday that these officers
> tried to break your neck?  Do you remember that?
>
> A:  You know, after I – I remembered – I remembered everything when I –
> when they – when I actually went and – actually see the video and hear
> the audio.  That put me back in that situation that day.  So it is hard –
> you're trying to say that I changed my story and I'm doubling down.  It is
> just . . . I never got to hear the video or the audio until the very end.
>
> Q:  So you do admit, and you do realize, that you have never, in five years,
> said to anyone, in any circumstance, including under oath, that they tried
> to break your neck?  Yesterday was the first time.  Do you realize that?
>
> A:  Yes.
>
> Q:  And, again, when we're talking about someone who is suffering from
> delusions, how is the jury supposed to know what is real and what isn't
> when you do – when you say things like that?

*Id*. at 162:7-163:7 (Dkt. 187).  This line of questioning related to the subject matter of Mr.

Rush's direct examination as well as Mr. Rush's credibility.  As a result, it is consistent with

FRE 611(b) and therefore appropriate.

### d.  *Felony Arrests and Conduct Amounting to a Felony*

Defendants' counsel confirmed with Mr. Rush that, due to his conduct on October 4,

2017, he had been "arrested for several felonies" and that hitting a law enforcement officer

constitutes a felony.  *Id*. at 163:22-24, 207:10-208:5.  Mr. Rush argues that such questioning was

**MEMORANDUM DECISION AND ORDER - 21**

improper because he was not asked about the crimes for which he had been arrested during direct examination. Mem. ISO Revised Mtn. for New Trial at 12 (Dkt. 191-1). For the same reasons discussed above in connection with opening statement, Plaintiff's commission of felonies, and his arrests therefor, were relevant and admissible to provide context for Defendants' subsequent deployment of pepper spray. *Supra*. And by the time Mr. Rush testified, the jury had heard multiple references to his felony arrest, including by Mr. Rush's counsel.[11] There was no plain error from this line of questioning.

    e.  *Conversations and Communications with Mr. Rush's Lawyers*

    Mr. Rush takes issue with how Defendants' counsel questioned him about his relationship with his lawyers, in particular whether he remembered calling his public defender a "punk-ass public defender." Mem. ISO Revised Mtn. for New Trial at 12 (Dkt. 191-1) (quoting Tr. at 299:23-24 (Dkt. 187)). But the Court sustained Mr. Rush's counsel's objection to this question anyway. Tr. at 299:25-300:2 (Dkt. 187).[12] And even after Defendants' counsel moved on, Mr. Rush nonetheless volunteered (when responding to an altogether different question) that he actually "did call a public defender a 'punk bitch.'" *Id*. at Tr. at 300:20-23. There is no attorney misconduct here.

    f.  *Denials of Battery, Obstruction, or Resisting*

---

  [11] There is again no question in the Court's mind that the jurors already understood that Mr. Rush had been arrested for his conduct on October 4, 2017. The preliminary jury instructions (given to the jury before opening statements) referenced this. Jury Inst. No. 2 (Dkt. 182). Mr. Rush's counsel's opening statement mentioned this. Tr. at 11:19-12:4, 19:8-12 (Dkt. 186). Mr. Wasdahl testified to this. *Id*. at 60-9-14, 65:8-66:3. And Mr. Rush's direct-examination testimony discussed this at length. *Id*. at 91:16-21, 106:4-13.

  [12] The stated objection was for "lack of foundation [and] beyond the scope," not as argumentative. Tr. at 299:25-300:1 (Dkt. 187). Defendants incorrectly state that Mr. Rush's counsel did not object to this question. Opp. to Revised Mtn. for New Trial at 11 (Dkt. 192).

In response to questions from Defendants' counsel, Mr. Rush denied that he battered Defendant Heida and that he resisted arrest. *Id*. at 212:12-213:5. Mr. Rush claims that this inquiry was improper because it related to issues not before the jury. Mem. ISO Revised Mtn. for New Trial at 12 (Dkt. 191-1). But Mr. Rush's conduct immediately preceding the alleged pepper-spraying down his pants helped explain what was happening at the time. *Supra*. Characterizing Mr. Rush's conduct as "resisting" and "battering" in the questions was not improper. Regardless, "questions . . . by lawyers are not evidence." Jury Inst. No. 6 (Dkt. 183). And there is no prejudice. Mr. Rush denied these claims when asked and the Court did not permit impeachment with his misdemeanor convictions for resisting arrest and battery. Tr. at 213:15-22 (Dkt. 187).

3.   Linda Rush's Cross-Examination

During direct examination, Linda Rush (Mr. Rush's mother) testified how her son has been impacted by the events on October 4, 2017. She noted how Mr. Rush is anxious, stressed, depressed, highly emotional, afraid, and has trouble sleeping. *Id*. at 551:18-553:7 (Dkt. 188). On cross-examination – ostensibly to impeach Ms. Rush on her basis for knowing these alleged impacts; namely that Mr. Rush had been apart from her continuously since 2017 – Defendants' counsel asked Ms. Rush whether her son "has been in jail, mental hospitals, or prison continuously since the day of his arrest back in 2017 . . . ." *Id*. at 553:17-21. Mr. Rush argues that he was unfairly prejudiced by this line of questioning. Mem. ISO Revised Mtn. for New Trial at 12-13 (Dkt. 191-1).

The Court agrees that the question was imprecise and objectionable. A better question would have been a sanitized version: "You have not lived with your son since 2017, correct?" Critically, however, Mr. Rush's counsel objected to the question, the Court sustained the objection, and instructed the jury to disregard the question. Tr. at 553:22-555:5 (Dkt. 188).

**MEMORANDUM DECISION AND ORDER - 23**

Again, questions are not evidence and the jury was so instructed. Jury Inst. No. 6 (Dkt. 183). And the jury is presumed to have followed the Court's remedial instruction. *Caudle*, 224 F.3d at 1023. Accordingly, this single objectionable question presents no basis for a new trial.

       4.     Defendants' Direct Examination

       Mr. Rush raises several overarching claims of unfair prejudice across Defendants' direct examination. For each, he argues that Defendants' counsel disregarded a Court order by relying on the dash-cam videos to organize Defendants' testimony, before more specifically criticizing Defendants' counsel for repeatedly stopping the videos to accentuate Mr. Rush's offensive and delusional statements. Mem. ISO Revised Mtn. for New Trial at 13-15 (Dkt. 191-1). Mr. Rush's counsel did not object to these instances until moving for a new trial. These arguments are without merit.

       First, there is no Court order that limited the use of the dash-cam videos at trial – at least not in the way that Mr. Rush now suggests. Instead, following pre-trial motions, the Court precluded the "unredacted audio regurgitation" of Mr. Rush's criminal history. 4/15/22 MDO at 22 (Dkt. 156) (presented in the context of real-time communications from police dispatch and Mr. Rush's parole officer and responding to Mr. Rush's argument that his past criminal history be excluded). This prohibition, however, did not extend to either party's use of the dash-cam videos at trial, especially where the videos recorded much of the incident and the parties stipulated to their admission without reservation. *Supra*. Both Mr. Rush's counsel and Defendants' counsel were permitted to use – and did use without specific objection – these videos to elicit testimony from witnesses pertaining to the incident (before, during, and after).

       Second, there is nothing objectively wrong with stopping the video to allow a witness to comment on what is taking place or to clarify a matter in dispute. And, as stated above, the instances where the video captured Mr. Rush's crude and raving language provided insight into

**MEMORANDUM DECISION AND ORDER - 24**

his agitated and delusional behavior at relevant points in time, including the incident itself.  *Id*.

The check on any needlessly cumulative evidence is an objection under FRE 403 from opposing

counsel.  Without one (and without commenting here on the merits of such an objection had one

even been made during trial), Defendants' counsel's use the dash-cam videos during Defendants'

direct examination was not improper.[13]

>5.     John Kapeles's Direct Examination

Mr. Kapeles is a chemical engineer.  He is the person primarily responsible for the

engineering and product development of the "Less Lethal" product line at Safariland, LLC

("Safariland").  Tr. 765:16-768:1 (Dkt. 189).  Safariland manufactured the MK-3 First Defense

aerosol spray used by the Idaho State Police, including Defendants, on October 4, 2017.  *Id*. at

772:12-16.  Mr. Kapeles testified as an expert witness during Defendants' case-in-chief.

Following pre-trial motions, the Court outlined the permissible scope of Mr. Kapeles's

testimony at trial.  With respect to his critique of Mr. Rush's expert reports, Mr. Kapeles was

allowed to testify to (i) technical discrepancies (nomenclature-related) in the chemical

composition of pepper sprays generally, and the MK-3 product specifically; (ii) the claimed-

association between red "splotches" on Mr. Rush's pants and any corresponding administration

of pepper spray thereon; (iii) inconsistencies between the composition of capsaicinoids found in

---

[13]   More specific to Defendant Weinstein, Mr. Rush argues that Defendants' counsel stopped and asked him about Mr. Rush calling him a "Nazi" and having him tell the jury that he is Jewish.  Mem. ISO Revised Mtn. for New Trial at 14 (Dkt. 191-1).  Actually, with no prompting, Defendant Weinstein testified about how these matters came about.  Tr. at 671:8-672:7 (Dkt. 188) (responding to Defendants' counsel's request that he "walk us through what your conversations were," Defendant Weinstein stating in part: "He at one point, brought up that the Nazis were burying Jews underneath the ports.  At one point, he brought up something and I told him, No, that's not true because I'm Jewish.  I think it was – I can't recall what he had called me.").  It was only then that Defendants' counsel attempted to clarify whether Mr. Rush accused Defendant Weinstein of being a Nazi.  *Id*. at 672:8-13 (Q: "Did he accuse you of being a Nazi?" A: "I think so.  I can't recall."  Q: "All right.  But, somehow, your religion came up?"  A: "Yeah.  And I just threw it out there, No, that can't be, I'm Jewish.").

Mr. Rush's clothing and the pepper spray allegedly used by Defendants; and (iv) selective reliance on incomplete data points to draw inferences, specifically concentrations of compounds on selected areas of Mr. Rush's pants and boxer shorts.  4/15/22 MDO at 7-8 (Dkt. 156). Conversely, Mr. Kapeles was not allowed to testify (i) about alternate explanations for how properly-deployed pepper spray directed at Mr. Rush's upper body could still be detected within his pants and boxer shorts (either via an undisclosed spray plume analysis or chemical component migration theory), and (ii) that no pepper spray could have been deployed by a cannister detected down Mr. Rush's pants.  *Id.* at 8-9.

Relevant here, Mr. Kapeles testified at trial about how the component parts of pepper sprays are generally identified using liquid chromatography, and how, in the same way, pepper sprays can be differentiated from one another:

> Q:  All right.  So you talk about assays.  Can you be a little more specific of what you mean when you say that?
>
> A:  Assay refers to a quantitative analysis.  So an analytical chemist will determine, not just if something is in there, but how much of it is in there. So in the case of our pepper sprays, we want to know, is it 50 percent capsaicin or is it 46 percent capsaicin.  And that's what the analytical chemist will tell us is how much is in there, not just whether it is in there.
>
> Q:  And getting, maybe, a little too much into the weeds, is this what liquid chromatography is about?
>
> A:  That's correct.  That's one of the analytical techniques that the chemist would use to determine that.
>
> Q:  So the difference is in liquid chromatography, when you're trying to get, say, capsaicin versus nordihydro[capsaicin] versus dihydro, how close are those on the chromatography scale?
>
> . . . .[14]

---

[14]  During a sidebar at this point, Mr. Rush's counsel argued that liquid chromatography is not Mr. Kapeles's expertise. Tr. at 788:21-789:5 (Dkt. 189).  This may be true.  However, the Court confirmed with Mr. Rush's counsel that Mr. Kapeles, through his training and experience,

Q:    When we left, we were talking about chromatography and how closely the various capsaicinoids resemble each other.  Could you be a little more specific and kind of help the jury out on this?

A:    Chromatography is a separation technique that the chemists use to separate a mixture by passing it through a medium.  A medium is just like a gas or a liquid.  And then taking advantage of the fact that the components of that mixture travel through the medium at different rates.  And so the term they use is retention time.  And so as they pass this through the medium, different components of the mixture have different retention times.  And that's how they can separate one product from another.

In the case of pepper spray and capsaicinoids, those components are those major capsaicinoids we talked about, dihydrocapsaicin and nordihydro[capsaicin].  And they all have different retention times in the chromatography.

Q:    When you say "different," are they similar to each other?

A:    Some can be very similar.  That's part of the issues sometimes with doing chromatography is if they have the same retention time, it is hard to tell if it is one compound or another.

Q:    All right.  And have you experienced that in your own world?

A:    I've seen instances of it where the – where two specific capsaicinoids have the same retention time.  And it is well documented in the literature, capsaicin and nonivamide have the same retention time.  So the chemist has to use other techniques to try to get that separation to occur.

Tr. at 787:24-792:8 (Dkt. 189).  Boiled down, the Court understands from this testimony that liquid chromatography can reveal a pepper spray's unique fingerprint (by the capsaicinoids' different "retention times") that is distinguishable from other pepper sprays.

Like before, Mr. Rush now argues that Mr. Kapeles's testimony concerning liquid chromatography is beyond the scope of his expertise and should not have been permitted at trial.

*Compare* Mem. ISO Revised Mtn. for New Trial at 15 (Dkt. 191-1), *with* Tr. at 788:21-789:5

---

is still aware how people within Safariland test for the presence of capsaicinoid compounds using liquid chromatography.  *Id*. at 789:6-25.

**MEMORANDUM DECISION AND ORDER - 27**

(Dkt. 189).  But this exaggerates Mr. Kapeles's testimony.  Mr. Kapeles discussed only how liquid chromatography can be used to identify a pepper spray's capsaicinoid composition – what Safariland chemists do when quality-controlling its own product and assessing competitor products. Tr. at 785:21-786:25, 789:6-17 (Dkt. 189).[15]  He never claimed to have actually conducted such testing on Mr. Rush's clothing, nor was he even qualified to do so.  Critically, he offered no expert opinion about liquid chromatography; he just provided his understanding of how the test is conducted as background.  Conversely, the import of his testimony was only that the pepper spray identified on Mr. Rush's pants and boxer shorts was not from an MK-3 pepper spray based on its composition, and criticized how Mr. Rush's experts (and counsel) tried to make that connection.  *See, e.g.*, Defs.' Expert Discl. at 6, 13 (Dkt. 106-2); Kapeles Aff. at ¶¶ 11, 16 (Dkt. 74-6); Tr. at 821:15-824:10 (Dkt. 189).  Liquid chromatography provided the argument for Defendants' counsel to connect these dots.  No pre-trial order was violated in this respect. *Supra* (noting that Mr. Kapeles could testify about (i) technical discrepancies in the chemical composition of pepper sprays, including the MK-3 product; and (ii) inconsistencies between the composition of capsaicinoids found in Mr. Rush's clothing and the MK-3 product).

   6.   Port of Entry Employees' Direct Examination

   Defendants' counsel questioned four Port of Entry employees (Pedro Melchor, Mike Jack, Devin Dascenzo, and Kim Gale) as part of their case-in-chief.  Tr. at 827, 855, 865, 878 (Dkt. 189).  Mr. Rush argues that these witnesses were improperly used to cumulatively discuss irrelevant and prejudicial facts.  Mem. ISO Revised Mtn. for New Trial at 16 (Dkt. 191-1).  The

---

[15]  Because the Court allowed Mr. Kapeles to testify about liquid chromatography generally given his training and experience, Mr. Rush argues that it was unfair for the Court not to allow Mackenzie Bentley (one of his experts) to testify about aerosol spray patterns given discussions she had with her boss.  Mem. ISO Revised Mtn. for New Trial at 15-16 (Dkt. 191-1). Setting aside the false equivalence, the Court held that neither party's experts could testify about spray plumes.  4/15/22 MDO at 9, n.5 (Dkt. 156).

**MEMORANDUM DECISION AND ORDER - 28**

Court disagrees.  Each of these individuals were eyewitnesses to the incident.  The fact that each of these witnesses may have seen (and not seen) the same thing and testified accordingly at trial does not make their testimony needlessly cumulative.  The consistency in their testimony, while possibly prejudicial to Mr. Rush, was not unfairly so.  It was relevant to the parties' claims and defenses and assisted the jury during deliberation.

       7.    <u>Closing Argument</u>

Mr. Rush argues that he was unfairly prejudiced at trial when, during Defendants' closing argument, counsel (i) again told the jury that Mr. Rush committed a felony, (ii) brought up other non-felony criminal charges not at issue in the case, (iii) repeatedly painted Mr. Rush as violent and insane, (iv) insinuated misconduct by the way Mr. Rush's counsel handled and coordinated the testing of the clothing Mr. Rush wore on the day of his arrest, (v) misrepresented expert opinion and testimony about the presence of "red dye" on Mr. Rush's clothing, (vi) misrepresented expert opinion and testimony pertaining to possible "cross-contamination" between Mr. Rush's clothing, and (vii) played additional portions of the dash-cam video that contained more of Mr. Rush's off-color and delusional comments.  Mem. ISO Revised Mtn. for New Trial at 16-22 (Dkt. 191-1).  Mr. Rush's counsel did not object to any of these instances until moving for a new trial.  These arguments are without merit.

Courts are less inclined to find that offending remarks made during closing argument pervaded the trial and prejudiced the jury.  *Supra* (citing *Settlegoode*, 371 F.3d at 518).  Federal courts "erect a 'high threshold' to claims of improper closing [arguments] in civil cases raised for the first time after trial."  *Hemmings*, 285 F.3d at 1193 (quoting *Kaiser Steel Crop. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986)).  The rationale for this high threshold is two-fold.  First, "raising an objection after the closing argument and before the jury begins deliberations permits the judge to examine the alleged prejudice and to admonish . . . counsel or

**MEMORANDUM DECISION AND ORDER - 29**

issue a curative instruction, if warranted." *Id*.  As noted above, the trial judge is in a superior

position to evaluate the likely effect of the alleged misconduct and to fashion an appropriate

remedy.  *Supra* (citing *Anheuser-Busch*, 69 F.3d at 346; *McIntosh*, 2010 WL 2698747, at *12).

Second, "allowing a party to wait to raise the error until after the negative verdict encourages

that party to sit silent in the face of claimed error." *Hemmings*, 285 F.3d at 1193.  Defendants'

counsel's above-referenced conduct does not meet this standard.

*a.     References to a Felony*

There is no dispute that hitting a law enforcement officer is a felony and that Mr. Rush

was arrested and charged with a felony after hitting Defendant Weinstein on October 4, 2017.

*Supra*.  Defendants' counsel reminded the jury of this during his closing argument.  Tr. at

1020:3-4, 1025:8-11, 1026:1-4, 1029:24-1030:1, 1038:1-3 (Dkt. 190).  Mr. Rush argues that such

references were improper because (i) the Court previously ruled that defense counsel was not to

raise this as a point, and (ii) the matter had already been adjudicated and Mr. Rush already

served a six-month sentence.  Mem. ISO Revised Mtn. for new Trial at 17 (Dkt. 191-1).  The

Court disagrees.

As stated above, Mr. Rush's commission of a felony was relevant to this case: *it explains

why pepper spray was deployed in the first place*.  *Supra*.  In addition, these references did not

violate the Court's April 15, 2022 Memorandum Decision and Order.  *Id*.  Mr. Rush's reliance

on a sidebar conference to prove otherwise is misplaced.  Mem. ISO Revised Mtn. for New Trial

at 17 (Dkt. 191-1) (citing Tr. at 213:9-215:3 (Dkt. 187)).  At that time, Mr. Rush had just

testified that he neither resisted arrest nor battered Defendant Heida.  Tr. at 212:12-213:5 (Dkt.

187).  Defendants' counsel then requested a sidebar, during which he sought to impeach Mr.

Rush's testimony with his misdemeanor convictions admitting to the same.

**MEMORANDUM DECISION AND ORDER - 30**

*Id*. at 213:9-215:3.  The Court denied Defendants' counsel's request to impeach with the misdemeanor convictions to avoid litigating a collateral matter (including whether Mr. Rush had already served his sentence for them), not because such impeachment was improper (Mr. Rush's trial testimony *was* inconsistent with his guilty pleas admitting to the conduct).  *Id.* at 214:19-215:2.  Instead, under FRE 609, the Court allowed Defendants' counsel generally to impeach Mr. Rush's credibility with his prior felony conviction.  *Id*. at 215:7-9.  Accordingly, Mr. Rush misconstrues the nature of this sidebar exchange and the Court's ruling.  There was no blanket ruling that Defendants could not reference that Mr. Rush committed a felony on October 4, 2017.  In sum, Defendants' counsel's closing argument in this regard was not improper.

        *b.*     *Other Non-Felony Criminal Charges*

During his closing argument, Defendants' counsel noted that Mr. Rush resisted arrest.  Tr. at 1021:10-13 (Dkt. 190).  Mr. Rush argues that this reference was improper because *that* issue was irrelevant to the case.  Mem. ISO Revised Mtn. for New Trial at 17 (Dkt. 191-1).  As stated above, this conduct helps explain what was happening at the time Mr. Rush claimed to be pepper-sprayed down his pants.  *Supra*.  Separately, Mr. Rush suffered no prejudice by this remark.  *Id*.  He denied that he resisted arrest and, more importantly, the jury was able to assess the merits of this dispute on its own from the videos entered into evidence.  *Id*.

        *c.*     *References Painting Mr. Rush as Violent and Insane*

Mr. Rush's mental state was an issue at trial.  *See, e.g.*, 4/15/22 MDO at 11 (Dkt. 156) ("Plaintiff's mental illness is relevant to his ability to perceive and recall the events giving rise to the instant dispute.").  This topic was understandably featured throughout trial (by *both* counsel), including during Defendants' counsel's closing argument.  Tr. 1026:1-4 (Dkt. 190).  Mr. Rush argues this was improper.  Mem. ISO Revised Mtn. for New Trial at 17 (Dkt. 191-1).  As stated

**MEMORANDUM DECISION AND ORDER - 31**

above, Defendants' counsel's references to Mr. Rush's mental illness and delusional comments were appropriate topics at trial. *Supra*.

        d.      *Mr. Rush's Counsel and Chain-of-Custody Issues*

Well before trial, the Court confirmed with the parties that there were no chain-of-custody issues pertaining to the handling of Mr. Rush's clothing for forensic testing. *See* 9/20/21 MDO at 9, n.3 (Dkt. 110); *see also* Tr. at 446:16-24 (Dkt. 188). On the second day of trial, however, it became apparent that Mr. Rush's forensic expert – Ms. Bentley – did not actually test the pants Mr. Rush wore on October 4, 2017; instead, she tested an altogether different pair of pants, and, as it turned out, that pair still tested positive for remnants of pepper spray. Tr. at 384:13-386:6, 400:3-19 (Dkt. 187).

Ms. Bentley's testimony was a surprise to the Court and Defendants' counsel. *Id.* at 388:12-390:25. Indeed, the Court previously had convened a summary judgment motion hearing, and ruled upon the motion, assuming that Mr. Rush's expert had tested the pants that Mr. Rush wore on October 4, 2017. *See, e.g.*, 9/20/21 MDO (Dkt. 110). Conversely, Mr. Rush's counsel became aware of this two-to-three-weeks before trial, but did not inform Defendants' counsel or the Court. Tr. at 398:23-399:1 (Dkt. 187), 433:20-434:8 (Dkt. 188).

When the mistake came to light during trial, Mr. Rush's counsel stridently argued that it was a non-issue (based on the scope of Ms. Bentley's direct examination under FRE 611) and not his fault. *Id*. at 387:9-392:9, 394:18-421:1 (Dkt. 187), 433:14-440:18 (Dkt. 188). The Court eventually permitted Defendants' counsel to cross-examine Ms. Bentley regarding the other pair of pants, but precluded any mention of Mr. Rush's counsel's involvement as an intermediary in the chain of custody between the jail and Ms. Bentley. *Id*. at 444:5-445:14, 446:3-15, 450:4-7, 451:1-2, 451:25-452:5 (Dkt. 188) (Court not wanting Mr. Rush's counsel to become a witness in his client's trial).

**MEMORANDUM DECISION AND ORDER - 32**

During his closing argument, Defendants' counsel stated matter-of-factly that Mr. Rush's counsel sent the clothes to his experts for testing.  *Id.* at 1031:11-12 (Dkt. 190) ("The clothes end up in the hands of Mr. Olsen, who then sends them to a lab."); *see also id.* at 1036:18-19 (Defendants' counsel stating: "The clothes were in the jail, and they were given to Mr. Olsen, period.").  Mr. Rush argues that these statements defied the Court's order not to place Mr. Rush's counsel within the clothing's chain of custody and improperly prejudiced him at trial.  Mem. ISO Revised Mtn. for New Trial at 19 (Dkt. 191-1).  Though a closer call, the Court ultimately disagrees.

Defendants' counsel pushed the envelope and erred when he brought up Mr. Rush's counsel's role in sending Mr. Rush's clothing to his experts for testing.  But the error ultimately is one of Mr. Rush's counsel's own making.  At a minimum, it was improvident for Mr. Rush's counsel not to notify Defendants' counsel or the Court of the testing mix-up.  Surely, he could have foreseen that the issue might arise during Ms. Bentley's cross-examination, and that Defendants' counsel and the Court would have to scramble to address it mid-trial.  The Court tried to extricate Mr. Rush's counsel from the chain of custody and avoid him becoming a witness as best it could.  But given the circumstances, Defendants' counsel certainly can be excused for two offhanded references to Mr. Rush's counsel receiving Mr. Rush's clothing from the jail and sending it off to Ms. Bentley for testing.

Notwithstanding, there was no prejudice to Mr. Rush from Defendants' counsel's argument.  First, on cross-examination of Ms. Bentley, and before the surprise became apparent, Ms. Bentley testified that Mr. Rush's counsel sent her two evidence bags full of Mr. Rush's clothing to test.  Tr. at 385:10-20 (Dkt. 187).  Counsel for Mr. Rush did not object to this testimony.  Thus, in closing argument, Defendants' counsel technically did not argue facts not in evidence; he just overstepped the Court's remedial measure.

**MEMORANDUM DECISION AND ORDER - 33**

Second, there was no evidence that the two bags of clothing that Mr. Rush's counsel received from the jail had been opened by him before he sent it to Ms. Bentley.  Indeed, Ms. Bentley appeared to receive the bag in a pristine, unopened state.  *See, e.g.*, *id*. at 398:1-10, 434:9-12, 455:1-456:1, 458:15-24, 496:6-17, 502:16-19 (Dkt. 188); Jury Inst. No. 25 (Dkt. 183). As such, the jury could not have concluded that counsel for Mr. Rush was involved in intentionally cross-contaminating the clothing for his client's benefit.

Finally, Defendants' counsel's argument was not directed at counsel for Mr. Rush in an attempt to implicate him in any wrongdoing.  Instead, counsel's objective was to erase any thought that the Defendants *themselves* were within the chain of custody and had access to the clothes.  *See, e.g.*, Tr. at 447:2-5 (Dkt. 188) (Defendants' counsel stating during trial: ". . . I know there's not an issue of chain of custody, but we can't let it be believed by this jury that *we* sent them to the expert.") (emphasis added).  While Defendants' counsel might have done this differently, there was little, if any, prejudice to Mr. Rush.  This is no basis for a new trial.

> e.    *Red Dye on Mr. Rush's Clothing*

During his closing argument, Defendants' counsel indicated that Mr. Rush's expert, Ms. Bentley, found "red dye" on the pair of pants she tested.  *Id*. at 1031:20-1032:2 (Dkt. 190).  Mr. Rush argues that this is incorrect because Ms. Bentley identified only "red splotches" on the pair of pants, not red dye.  Mem. ISO Revised Mtn. for New Trial at 19 (Dkt. 191-1).  Any distinction between these terms is immaterial.

During trial, the parties, their counsel, and the parties' experts frequently used the terms "red dye" and "red splotches" interchangeably – likely because Ms. Bentley used those same two terms in her expert report.  Tr. at 465:16-472:22 (Dkt. 188); *see also id*. at 491:11-12 (Mr. Rush's counsel asking: "Okay.  Now, just to clarify the whole red dye, red splotches issue. . . ."); *id*. at 944:5-8 (Dkt. 189) (Mr. Rush's expert, Vanessa Fitsanakis, stating: "Correct.  Because that

**MEMORANDUM DECISION AND ORDER - 34**

was never – trying to analyze red dye or red splotches *or fill in the blank with your favorite red*, was never part of the analysis.") (emphasis added).  Defendants' counsel's closing argument actually confirmed this parallel usage when he said: "She found pepper spray residue on the wrong pair of pants.  But much more important, really, is that she also said she found *red splotches or red dye* on these pants."  *Id*. at 1031:15-19 (Dkt. 190) (emphasis added).  There is no error here.

      *f.    Cross-Contamination*

Before trial, the Court ordered that neither party's experts could opine about alternate explanations for how pepper spray residue could have migrated from Mr. Rush's t-shirt (or the ground) to his pants and boxer shorts.  4/15/22 MDO at 8-9 (Dkt. 156).  This limitation specifically included a theory about cross-contamination, namely, that Mr. Rush's pepper-sprayed shirt cross-contaminated his pants and boxer shorts while in storage.  *Id*. at 9.  At trial, the Court clarified that this limitation extended to a party's cross-examination of the other party's experts.  Tr. at 404:7-13, 409:12-410:9, 421:2-10 (Dkt. 187), 444:21-445:7 (Dkt. 188).

However, while testifying on cross-examination, Mr. Rush's expert, Dr. Fitsanakis, suggested that cross-contamination possibly explained the presence of pepper spray on the pair of pants and boxer shorts that Ms. Bentley tested:

> Q:    Were you aware before trial that [Ms. Bentley] had found nonivamide and vanillic acid on the wrong pair of pants?
>
> A:    A little bit before trial, but not very –
>
> Q:    Not much?
>
> A:    Not much.
>
> Q:    All right.  Did it give you pause at all that maybe the testing – there might have been some flaw somewhere?

A:    It did not.  And it did – So did it give me pause?  Yes.  It gave me pause.  And I had to go back and look at the analysis.  The – the article of clothing that was – that was really in question was the boxer shorts.  And when we went back and looked at the total amount of capsaicin – of capsaicinoids on the boxer shorts, compared to the jeans, there was still more nonivamide on the boxers than there were on the jeans.

Q:    Well, that is true.  But there's not supposed to be any nonivamide on the jeans at all if he didn't wear them on the day in question; isn't that true?

A:    The – because the clothing *were stored together*, and because there was more nonivamide on the boxers than there were on the jeans, and because the boxers were the article of clothing that were the main focus, it did not give me as much pause as it would have if the chemical analysis had been totally reversed.

Q:    *You're speaking about cross-contamination*?

A:    *Correct*.

Q:    And so have you done any testing on cross-contamination of clothing involving capsaicins?

A:    I have not.

Q:    Have you read any literature on cross-contamination of capsaicins on clothing?

A:    I don't believe so.

Q:    *All right.  So you're assuming it is cross-contamination as a given, then; is that right?*

A:    *I am not.  I am not assuming that that is a given*.  As a – as a scientist, part of what – part of what we do, as scientists, is we look at the objective data.  And objective data is that data which is determined, maybe without a story behind it.  So, for example, the chemical analysis that Ms. Bentley conducted would have been objective chemical analysis, because the machine didn't get to – didn't get to choose.  The machine didn't get to make decisions.  *And so when I'm looking at the objective chemical data, then part of what I wonder about is how that could have happened.*  However, the analysis that was conducted was not done in such a way that we could have – that we can determine that.  So the focus of the analysis was, are there capsaicinoids on the boxers.  And if yes, what are they?

Q:    All right.  So you don't – *you really can't speak to cross-contamination one way or another then; isn't that correct?*

**MEMORANDUM DECISION AND ORDER - 36**

A:    *That's correct.*

*Id*. at 940:5-942:23 (Dkt. 189) (emphasis added).  Mr. Rush's counsel did not object to this

exchange during trial.  Indeed, on redirect examination, Mr. Rush's counsel inquired about cross-

contamination.  *Id*. at 945:2-4 (Mr. Rush's counsel asking Dr. Fitsanakis that she was not tasked

to look for cross-contamination).

During his closing argument, Defendants' counsel brought up Dr. Fitsanakis's above-

referenced testimony to explain Ms. Bentley's results:

> All right.  Assuming that there's any credibility at all now to the testing, given
> that they found pepper spray on pants he didn't wear, then what?  How did it get
> in his underwear?  I mean, isn't that the obvious question?
>
> Well, I can tell you for sure, [Defendants] didn't force their hands down his
> pants.  Otherwise, they are all perjuring themselves.  Which you saw them all
> testify.  You know they told the truth.
>
> So what is an alternate theory?  Who told you?  Their own expert, Vanessa
> Fitsanakis.  Well, they were all in the same bag.  Oh, you mean they cross-
> contaminated?  Yes.  So you're telling me that the underwear and the pants he
> didn't wear cross-contaminated?  Yes.  That kind of makes sense that
> [Defendants] told you on day one, when you take clothes with pepper spray and
> you put them all together and you put them in a bag and you leave them there
> for two years, it is going to cross-contaminate.
>
> How do we know that?  How can you be 100 percent sure there was cross-
> contamination? It was the shirt.  Remember I told you, you saw he had his jacket
> on, zipped up.  How does pepper spray end up on his shirt, on his back?  How
> does that even happen?  Did the pepper spray that [Defendant Murakami] fired
> take a U-turn?  No.  It is cross-contamination.

*Id*. at 1035:12-1036:16 (Dkt. 190).  Mr. Rush now objects to these statements, arguing that they

ignored the Court's order precluding experts from testifying about cross-contamination.  Mem.

ISO Revised Mtn. for New Trial at 20-21 (Dkt. 191-1).  The Court disagrees.

To begin, Dr. Fitsanakis *herself* theorized how cross-contamination may have accounted

for the presence of pepper spray on a pair of pants not worn on October 4, 2017.  Critically,

**MEMORANDUM DECISION AND ORDER - 37**

Defendants' counsel did not posit the theory to her; instead, he asked only about flaws in Ms. Bentley's analysis and the incongruity of a pepper spray component appearing on pants Mr. Rush did not wear on the day of the incident.  In response, Dr. Fitsanakis volunteered the theory of cross-contamination.  Appropriately, then, Defendants' counsel asked follow-up questions.

But more crucially, the Court never precluded Defendants' counsel from *arguing* about cross-contamination.  Just the opposite.  4/15/22 MDO at 9 (Dkt. 156) ("Defendants' counsel may still make these common-sense arguments to the jury for them to consider and resolve. . . . Again, Defendants' counsel may cobble the admitted evidence into such an argument at trial, but Mr. Kapeles himself, as an expert, cannot take such a stand.").  With all this in mind, it was not improper for Defendants' counsel to make cross-contamination-related arguments during his closing argument.[16]

### g.    *Further References to Portions of the Dash-Cam Videos*

During his closing argument, Defendants' counsel again played portions of the dash-cam videos for the jury's consideration.  Tr. at 1028:6-1029:10 (Dkt. 190).  This time, he did so to argue that, when being transported from the Port of Entry to the jail, Mr. Rush did not make any reference to being pepper-sprayed.  *Id.*  Mr. Rush argues that the use of the dash-cam videos for this purpose was improper.  Mem. ISO Revised Mtn. for New Trial at 22 (Dkt. 191-1).  As stated above, the Court disagrees.  The dash-cam videos were stipulated exhibits and showed Mr. Rush's behavior at relevant points in time.  *Supra.*  The argument was proper.

---

[16]   Mr. Rush also takes issue with how, as part of this portion of his closing argument, Defendants' counsel suggested that Mr. Rush's counsel was responsible for any cross-contamination.  Mem. ISO Revised Mtn. for New Trial at 21 (Dkt. 191-1) (citing Tr. at 1036:17-19 (Dkt. 190)).  This argument has already been addressed.  *Supra.*  Still, the jury was already instructed on this point.  Jury Inst. No. 25 (Dkt. 183) ("The parties have agreed that all of the clothing that Mackenzie Bentley tested was received on February 20, 2020 and was in the same paper bag and all together with the other clothing.  You must therefore treat these facts as having been proved.").

**MEMORANDUM DECISION AND ORDER - 38**

Mr. Rush's Motion for New Trial is denied in these respects.[17]

**C.    Defendants' Counsel's Conduct Is Not Sanctionable**

Mr. Rush claims that Defendants' counsel engaged in bad faith and should be sanctioned. Mem. ISO Revised Mtn. for New Trial at 26-27 (Dkt. 191-1).  This argument is premised upon the alleged impropriety of Defendants' counsel's conduct at trial.  *Id*.  However, Defendants' counsel's conduct does not remotely rise to the level of willful disobedience or bad faith.  *Supra*. Therefore, no basis for sanctions exists.

## IV.  <u>CONCLUSION</u>

Mr. Rush's arguments do not persuade the Court that he is entitled to the "extraordinary remedy" he seeks – vacating the jury's verdict and holding a new trial – which is "to be used sparingly in the interests of finality and conservation of judicial resources."  *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014).  The Court's security measures, and the alleged transport incident, did not inherently prejudice Mr. Rush at trial.  Indeed, this case is patently distinguishable from *Claiborne* because Mr. Rush was not visibly shackled and the issue of Mr. Rush's dangerousness was removed from the jury's consideration by virtue of the parties' stipulation and the Court's instruction defining excessive force.

Moreover, Defendants' counsel's conduct at trial was not improper.  While, at times, Defendants' counsel's questioning and arguments pushed the envelope of the Court's pretrial rulings, those rulings were not meant to sanitize the case of all contextual facts.  Instead, the

---

[17]   Mr. Rush's reply briefing argues, for the first time, that Defendants' counsel's "vouching" during closing argument provided an additional basis for a new trial.  Reply ISO Mtn. for New Trial at 8-11 (Dkt. 193).  The Court has no obligation to consider arguments raised for the first time in a reply brief and declines to do so here.  *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (holding that a "district court need not consider arguments raised for the first time in a reply brief") (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)); *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived.").

rulings were meant to focus the jury on the crucial issue – whether the Defendants purposely sprayed pepper spray down Mr. Rush's pants – and prevent experts from speculating about it. Defendants' counsel substantially complied with all of the Court's pretrial rulings.

Further, even if Mr. Rush could make out a plausible claim that Defendants' counsel did not, the Court finds that, given the totality of the circumstances, the jury's verdict was supported by sufficient evidence in the record.  That verdict will not be disturbed.  *Hemmings*, 285 F.3d at 1195 (concluding that a new trial was not warranted where, absent counsel's misconduct, the jury likely would have returned the same verdict).

## V.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiff's Motion for a New Trial and for Sanctions (Dkt. 181) is DENIED as moot; and

2.      Plaintiff's Revised Motion for a New Trial and for Sanctions (Dkt. 191) is DENIED.

DATED:  December 7, 2022



Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge